BERKES CRANE ROBINSON & SEAL LLP
Peter J. Marcus (SBN 202602)
  pmarcus@bcrslaw.com
Laurie S. Julien (SBN 136974)
  ljulien@bcrslaw.com
515 South Figueroa Street, Suite 1500
Los Angeles, California 90071
Telephone:     (213) 955-1150
Facsimile:     (213) 955-1155

HUSCH BLACKWELL
Scott Davis (TX 05547030) *Pro Hac Vice Pending*
  Scott.Davis@huschblackwell.com
Jason B. Heep (TX 24077587)  *Pro Hac Vice Pending*
  Jason.Heep@huschblackwell.com
Karen L. Tidwall (WI 6216945) *Pro Hac Vice Pending*
  Karen.Tidwall@huschblackwell.com
1900 N. Pearl Street, Suite 1800
Dallas, Texas 75201
Telephone:     (214) 999-6187
Facsimile:     (214) 999-6170

Attorneys for Plaintiff,
SUMCO PHOENIX CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUMCO PHOENIX CORPORATION, | CASE NO.  21-cv-472 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) BREACH OF CONTRACT** |
| | **(2) RECOVERY UNDER SECTION 107(a) OF CERCLA (42 U.S.C. § 9607(a))** |
| INTEGRIS/MILLENNIUM JOINT VENTURE, LLC, | **(3) RECOVERY UNDER SECTION 113(f) OF CERCLA (42 U.S.C. § 9613(f))** |
| Defendant. | **(4) RECOVERY UNDER SECTION 128 of HSAA (CAL. H&SC § 25363(e))** |
| | **(5) DECLARATORY JUDGMENT (28 U.S.C. § 2201)** |
| | **(6) COMMON LAW EQUITABLE INDEMNITY** |
| | **(7) EQUITABLE CONTRIBUTION (CAL. CIV. CODE § 1432)** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff SUMCO Phoenix Corporation ("SUMCO") complains of Defendant

Integris/Millennium Joint Venture, LLC ("Integris") and alleges:

**INTRODUCTION**

1.     This matter involves a dispute regarding responsibility for ongoing remediation of environmental contamination. SUMCO was the lessee and then the owner of a property with a silicon-wafer manufacturing facility. During the remediation of contamination from historical operations, SUMCO sold the property to Integris. The parties agreed that SUMCO would finish the ongoing remediation and that after the regulator stated that no further action was required, Integris would handle any required future remediation and indemnify and defend SUMCO against any such claim.

2.     In 2014, SUMCO received a no further action determination ("NFA") from the regulator after all required remediation was completed. Because of residual contamination, the property was subject to a deed restriction that prevented residential use and some other redevelopment. Integris agreed to this restriction.

3.     Under the terms of the October 23, 1998 Purchase and Sale Agreement ("PSA") between the parties, Integris assumed all responsibility for any future investigation and remediation of the property immediately upon the issuance of the NFA in 2014.

4.     In 2018, four years after the regulator determined that SUMCO was not obligated to complete any further remedial work, Integris and a proposed purchaser began to redevelop the property to build a hotel. Integris requested to have the case re-opened to have the deed restriction removed.

5.     As a result of the investigation of the removal of the deed restriction, the regulator required groundwater sampling. Elevated contaminant levels were found, prompting the regulator to require both SUMCO and Integris to investigate the contamination.

6.     Despite Integris being obligated under the sale agreement to be responsible for addressing this contamination, Integris refused to indemnify and defend SUMCO for these new obligations, causing SUMCO to incur remedial costs. Thus, SUMCO is suing to enforce the obligations and to seek indemnity. In addition, as described below, Integris is responsible for the remediation under both state and federal law, and at equity.

/ / /

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

2
COMPLAINT

Case No.  21-cv-472

## PARTIES

7.      Plaintiff SUMCO Phoenix Corporation is a Delaware corporation with its principal place of business at 19801 North Tatum Boulevard, Phoenix, Arizona. SUMCO manufactures silicon wafers used by companies worldwide to make integrated circuits and semiconductor devices that power electronic products.

8.      Defendant Integris/Millennium Joint Venture, LLC is a California limited liability company with its principal place of business at 3402 Millbrook Court, Fairfield, California. Integris has two members, Gary D. Williams and Kathleen A. Williams, adult residents of the State of California who reside at 910 Corriente Pointe Drive, Redwood Shores California. Integris' registered agent for service of process is Gary D. Williams.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over these claims pursuant to 42 U.S.C. § 9607, providing jurisdiction over controversies arising under Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); 28 U.S.C. § 1331, providing jurisdiction over federal questions; 28 U.S.C. § 2201 et seq., providing jurisdiction over declaratory relief actions; and 28 U.S.C. § 1367(a), providing supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the plaintiff and the defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.      This Court has personal jurisdiction over Integris. Integris is headquartered in this District and its sole business purpose is ownership of 3723 Haven Avenue, Menlo Park, California ("Property"), which is within this District.

11.      Venue lies in this District pursuant to 29 U.S.C. § 1132(e)(2) because (a) the breaches, violations, acts, and omissions that Integris is liable for arise in this District; (b) the real property that is the subject of this action is in San Mateo County, California is located in this District; and (c) Integris may be found in this District. Venue is also proper pursuant to  28 U.S.C.

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

3
COMPLAINT

Case No.  21-cv-472

§§ 1391(b) because the releases or threatened releases of hazardous substances that give rise to these claims are alleged to have occurred in this District, and, as explained above, the property at issue is located in this District.

**Intradistrict Assignment**

12.     This case arose in San Mateo County, California and under Rule 3-2(d) of the Local Rules of the Northern District of California, should be assigned to either the San Francisco or Oakland Division of the Northern District.

**FACTS**

**Property History**

13.     From 1970 through 1989, Siltec Corporation manufactured polished silicon wafers at facilities on three parcels it leased at 3705, 3715, and 3723 Haven Avenue, Menlo Park, California ("Site"). The Property in question is the northernmost parcel of the Site.

14.     In 1986, Mitsubishi Metals bought Siltec and renamed it Mitsubishi Silicon America. Mitsubishi Silicon America is now known as SUMCO and is the successor in interest to Mitsubishi Silicon America.

15.     Soil and groundwater contamination was found at the Site in 1994.

16.     SUMCO bought the Site in 1997 in order to conduct the remediation.

17.     Contaminated soil was excavated and disposed of off Site.

18.     A 1999 Risk Management Plan was prepared to address the residual concentrations in the soil and groundwater.

19.     SUMCO installed a vapor barrier and conducted extensive groundwater monitoring for 13 years and pilot testing of in-situ remediation.

**Integris Bought the Property from SUMCO**

20.     SUMCO sold the three Site parcels to Integris for $2,385,000 under the PSA. Title to the Site transferred in July 1999. Ex 1.

21.     Integris bought the Site "as is" pursuant to Section 3.1. of the PSA, with express written disclosure of the "presence, generation, treatment, removal or disposition of Hazardous Materials" and the "cost of remediating existing and future Hazardous Materials present or

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

4
COMPLAINT

Case No.  21-cv-472

1    released on, in, or into the air, soil, groundwater, surface water, or improvements at, on, about,

2    under, or within the Property at actionable levels under Environmental Laws." Ex. 1 at 4.

3         22.    Under Section 5.1. of the PSA, Integris acknowledged that the Property was

4    contaminated with trichloroethylene ("TCE"), dichloroethylene ("DCE"), vinyl chloride, and other

5    hazardous materials, including volatile organic compounds ("VOCs").

6         23.    Responsibility for any investigation and remediation of the Property was expressly

7    allocated between the parties under the PSA with (a) SUMCO responsible for finishing the

8    remediation required at the time and (b) Integris liable for any claims in the future.

9         24.    SUMCO's retained liability for environmental contamination at the Property

10   continued until the work described in the Feasibility Study/Remedial Action Plan was completed

11   and the San Francisco Bay Regional Water Quality Control Board ("Water Board"), which was

12   the regulator for remedial activity at the site, made a no further action determination.

13        25.    The PSA specifically provided that SUMCO's "responsibility for remediation of

14   the Property…shall cease with the State's issuance [through the Water Board] of a 'no further

15   action' determination or approved closure of the site."

16        26.    After SUMCO met its obligations under Section 5.1 of the PSA, Integris

17   "irrevocably and unconditionally release[d] and forever discharge[d]" SUMCO from various items

18   including:

19        (a)    claims involving the "physical condition" of the Site, including the presence and

20   treatment of contamination;

21        (b)    remediation costs after the work described in the Feasibility Study/Remedial

22   Action Plan is completed; and

23        (c)    compliance with government and environmental laws, including zoning

24   requirements for improvements and development of the Property and third-party claims.

25        27.    Integris also agreed to indemnify and defend SUMCO for any environmental

26   contamination claims after SUMCO completed the required work under the Feasibility

27   Study/Remedial Action Plan.

28        28.    The PSA stated:

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

5
COMPLAINT

Case No.  21-cv-472

In reliance upon Seller's representations and warranties set forth in Section 8.2, and to the extent that Seller satisfies its obligations under Section 5.1, Buyer hereby agrees to indemnify and defend (with counsel experienced and competent in litigating issues of Hazardous Materials) Releasees, and agrees to hold Releasees, harmless from and against any and all Claims.

29.     The PSA defines "Releasees" to include Mitsubishi Silicon America's successors and assigns, which include SUMCO.

30.     The PSA broadly defines "Claims" to include all obligations, liabilities, demands, and expenses related to "Hazardous Materials," compliance with any environmental regulations or laws, and remediation, except those remediation costs incurred before SUMCO completed the required work in the Feasibility Study/Remedial Action Plan.

31.     "Claims" are specifically defined by the PSA as:

all obligations, liabilities, claims (including sums paid in settlement of claims), demands, damages, actions, administrative proceedings (including informal proceedings), judgments, losses, fines, taxes, assessments, costs and expenses, including attorneys' fees, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, which the claimant (whether such claimant is Buyer or any third party) now has, owns or holds, or claims to have, own or hold, or at any time heretofore had owned, held, or claimed to have had, owned or held, against the Releasees, Seller or any third party, arising out of or related to:

(i)      the physical condition of the Property, including the presence, generation, treatment, removal or disposition of Hazardous Materials…on, under or at the Property or any part thereof;

(ii)     any government laws and regulations to which the Property may be subject, including, but not limited to, Environmental Laws…zoning and land use laws and regulations;

(iii)    Buyer's contemplated use and/or development of the Property;

(iv)     improvements or the construction of any new improvements;

***

(vi)     the content or accuracy of any report, study, opinion or conclusion of any

soils, toxic, environmental or other engineer or other person or entity who has investigated or examined the Property or any aspect thereof;

(vii)   the content or accuracy of any information released to Buyer by an engineer or planner in connection with the development of the Property;

***

(xi)   the cost of remediating existing and future Hazardous Materials present or released on, in, or into the air, soil, groundwater, surface water, or improvements at, on, about, under, or within the property at actionable levels under Environmental Laws;

(xii)   third party claims attributable to the cost of remediating existing and future Hazardous Materials present or released on, in, or into the soil, groundwater, surface water, or improvements at, on, under, or within the Property at actionable levels under the law;

***

(xiv)   third party claims for remediation costs and bodily injury attributable to Hazardous Materials present or released on, in, or into the soil, groundwater, surface water, or improvements at, on, about, under, or within other real property at actionable levels under Environmental laws that emanate from the Property after the date Seller completes the work described in the FS/RAP

32.   The PSA defines "Environmental Laws" to include all present and future federal, state, and local laws, and other requirements of agencies with jurisdiction under those laws related to the protection of human health or the environment or Hazardous Materials.

33.   "Environmental Laws" are specifically defined by the PSA as:

As used herein, the term "Environmental Laws" shall mean any and all present and future federal, state and local law (whether under common law, statute, rule, ordinance, agreement, regulation or otherwise). requirement under any permit issued with respect thereto, and other requirements of agencies having jurisdiction thereunder relating to the protection of human health or the environment, of the Hazardous Materials including, without limitation, the use, handling, transportation, production, disposal, treatment, discharge or storage thereof, including (without limitation) the Federal Insecticide, Fungicide, and Rodenticide Act. 7 U.S.C. §§136, et seq.; [sic] the Toxic Substances Control Act, 15. U.S.C. §§ 2601 et seq.; Federal Asbestos Hazard Emergency Response Act. 15 U.S.C. §§ 2641 et seq.; California Health & Safety Code §25915 et seq. (the "Connelly Act"); California Health & Safety Code § 25359.7; California Health & Safety Code §§ 2595 et seq.; California Labor Code §§ 6501.5 et seq.; the Comprehensive Environmental

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

Response Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601, et seq.), as heretofore or hereafter amended; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq. the Federal Water Pollution Prevention and Control Act. 33 U.S.C. §§ 1251 et seq.; the California Hazardous Waste Control Act, Health & Safety Code §§ 25100 et seq.; the California Hazardous Substance Account Act, California Health & Safety Code §§ 25300 et seq.; the California Safe Drinking Water and Toxic Enforcement Act, California Health & Safety Code §§ 25249.5, et seq. ("Proposition 65"); the California Hazardous Waste Management Act. California Health & Safety Code §§ 25170.1 et seq.; the California Health & Safety Code §§ 25501 et seq. (Hazardous Materials Response Plans and Inventory); the California Porter-Cologne Water Control Act. Water Code §§ 13000 et seq.; the California Health & Safety Code §§ 25280, et seq. (Underground Storage of Hazardous Substances), the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801, et seq.; the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1321; 42 U.S.C. §§ 7401 et seq. (the "Clean Air Act') and Title 22 of the California Code of Regulations.

34.     The "Hazardous Materials" to which this broad indemnity applied included the contaminants now at issue.

35.     Specifically, the PSA defined "Hazardous Materials" as follows:

As used herein, the term "Hazardous Materials" shall include any substance, chemical, or mixture which is (or which contains any substance, chemical, compound, or mixture which is):

(i)     a "Hazardous Substance," "Hazardous Materials," "Hazardous Waste," or "Toxic Substance" under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. section 9601, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. section 1801, et seq. or the Solid Waste Disposal Act, 42 U.S.C. section 6901, et seq., including any regulations promulgated thereunder as any of the foregoing may be amended;

(ii)    an "Acutely Hazardous Waste," Extremely Hazardous Waste", under section 25110.02, 25115, 25117 or 25122.7 of the California Health and Safety Code, or is listed pursuant to section 25140 of the California Health and Safety Code, as any of the foregoing may be amended;

(iii)   a "Hazardous Materials", "Hazardous Substance" or "Hazardous Waste" under section 25281, 25316, 25501, or 25501.1 of the California Health and Safety Code, as any of the foregoing may be amended;

***

(ix)    regulated by any other federal, state or local statute, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, or asbestos, as now or at any time hereinafter in effect or any other hazardous, toxic or dangerous waste, substance or material; or

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

8
COMPLAINT

Case No.  21-cv-472

(x)  hazardous, toxic, ignitable, radioactive, corrosive, or reactive and which is regulated by any public entity or under any law.

\*\*\*

36.  Section 12.8 of the PSA provides a dispute resolution process that required that the parties: (1) first negotiate in good faith to attempt to resolve any differences, which must include at least two meetings; (2) if negotiations fail, submit the controversy to mediation; and (3) if mediation does not succeed, proceed to arbitration or to court.

37.  The parties agreed that California law would govern the PSA.

38.  Integris knew and understood that the Property could not be developed for any residential use, or for hospitals, schools, or daycare centers unless Integris worked with the regulators to modify the deed restrictions for the Property and satisfied any regulatory requirement that the Property meet more rigorous environmental standards.

**Deed Restriction Binding Integris**

39.  A Covenant and Environmental Restriction ("Deed Restriction") was recorded for the Site in San Mateo County, California on August 9, 1999. The Deed Restriction incorporated the Risk Management Plan between Integris and the Water Board.

40.  As the Site owner, Integris signed the Deed Restriction, agreeing to its terms.

41.  The Deed Restriction allows site development only for industrial, commercial, or office-space use and prohibits development for residential purposes or for hospitals, schools, or daycare centers.

42.  The Risk Management Plan, which is incorporated as part of the Deed Restriction, states:

6.2  Maintaining Commercial/Industrial Land Use

The Site is restricted to commercial/industrial use, except that uses for day-care or primary education are explicitly not allowed. If other uses are proposed, the owner may make a proposal to the RWQCB or other appropriate agency, supported by analysis, that the provisions of this RMP should be changed.

43.  Under the Deed Restriction, Integris, as the owner of the property, had to evaluate changes at the Site and meet certain specified regulatory conditions, including limited groundwater monitoring of two monitoring wells. In addition, the Deed Restriction required

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

1    Integris, not SUMCO, to evaluate the conditions if an exceedance was found.

2        44.    The Risk Management Plan, which is incorporated as part of the Deed Restriction,

3    also stated:

4        To monitor the occurrence of VOCs in groundwater and the location of the
         Groundwater Risk Area, groundwater monitoring wells (i.e., MW-8 and MW-9)
5        will be installed at the perimeter of the Groundwater Risk Area. It will be the
         responsibility of the property owner to monitor the existing groundwater monitoring
6        wells and to verify that groundwater with concentrations of VOCs greater than risk-
         based action levels have not migrated outside of the Groundwater Risk Area.
7
         If COCs are detected in groundwater from wells located outside of the Groundwater
8        Risk Area at concentrations above the risk-based action levels (Table 4), the
         property owner should perform an evaluation of the potential for adverse impact to
9        human health. The evaluation should be based upon the then-current applicable
         laws, regulations, and appropriate human health risk assessment procedures to
10       determine the need for providing additional protection to on-Site workers.
11

12       45.    Because SUMCO no longer owns the Site, SUMCO has no obligations under the

13   Deed Restriction. SUMCO was never even a party to the Deed Restriction; Integris, not SUMCO,

14   signed it and the restrictions and obligations in the Deed Restriction apply only to Integris, the

15   property owner.

16                    **No Further Action Letter Issued by the Water Board**

17       46.    For more than a decade after the sale to Integris, SUMCO continued with

18   remediation and groundwater monitoring of the Site, including the Property, under the Feasibility

19   Study/Remedial Action Plan and in accordance with its obligations in the PSA.

20       47.    On December 31, 2013, SUMCO submitted to the Water Board a report entitled

21   "Summary of Environmental Conditions, and Request for Declaration of No Further Active

22   Remediation Status." This report documented SUMCO's extensive investigation, monitoring, and

23   remediation efforts and requested that the Water Board release SUMCO from any further

24   obligation to monitor the wells or conduct further remediation.

25       48.    On June 16, 2014, the Water Board issued an order entitled "No Further Action

26   Required at the Former Siltec site located at 3695-3723 Haven Avenue, Menlo Park, San Mateo

27   County" ("NFA"). Ex. 2. The Water Board determined that the Site met the criteria for a low-level

28   chlorinated solvent site and that no further action was necessary. Thus, SUMCO's remedial

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

10
COMPLAINT

Case No.  21-cv-472

1   obligations, including investigation or remediation duties, were complete.

2       49.     The NFA also stated, "In the event the current or future land owner(s) proposes a

3   more sensitive land use at the Site, we will require the use of up-to-date groundwater

4   information,…to evaluate the risk before any revision of the deed restriction can be granted."

5       50.     The case closure summary attached to the NFA confirmed that Integris as the

6   Property owner was "required to monitor on-Site VOC concentrations and perform certain other

7   actions to manage risk at the property" and that "SUMCO is not a party to the [risk management

8   protocol] or deed restriction."

9       51.     SUMCO's investigation and remediation of the Property from 1994 through 2013

10  satisfied its remedial obligations under the PSA.

11      52.     Under Section 5.1 of the PSA, once the NFA was issued Integris unconditionally

12  released and forever discharged SUMCO for liability for environmental contamination at the Site,

13  including claims involving the presence and treatment of contamination, future remediation costs,

14  and compliance with environmental laws.

15      53.     Under Section 5.1 of the PSA, once the NFA was issued, Integris was obligated to

16  indemnify and defend SUMCO against any claims for environmental contamination at the Site.

17      54.     Despite Integris being "required to monitor on-Site VOC concentrations and

18  perform certain other actions to manage risk at the property" under the NFA and conduct

19  monitoring and other activities under the case closure summary, Deed Restriction, and Risk

20  Management Plan, there is no sign that Integris conducted that required monitoring or any other

21  remedial activities.

22              **The Water Board Requested Additional Investigation**
                **Because of Integris' Redevelopment Plans**
23

24      55.     On information and belief, in December 2018 Integris agreed to sell the Property to

25  a real estate developer, FPG Development Group, to develop a nine-story hotel.

26      56.     Integris and FPG requested that the Water Board modify the Deed Restriction to

27  permit construction of the hotel.

28      57.     As part of its hotel development plan, FPG retained AWR Environmental, an

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

11
COMPLAINT

Case No.  21-cv-472

1  environmental consultant, to investigate the Property to assess the contamination levels.

2      58.    FPG submitted the initial site investigation report from AWR to the Water Board

3  for review.

4      59.    On June 11, 2019, the Water Board required SUMCO and Integris to conduct an

5  investigation of the Property "due to changed site conditions and planned redevelopment"

6  ("Reopener Letter"). Ex. 3. This directive was prompted by submission of the AWR report by

7  FPG.

8      60.    The Water Board included SUMCO in its directive because as a former owner of

9  the Property it continued to be responsible to the regulator as a Responsible Party under applicable

10 environmental regulations. This was precisely the reason for the indemnity agreement between

11 SUMCO and Integris.

12     61.    The Reopener Letter stated that "[p]reviously the site was cleaned up (by SUMCO)

13 for commercial and industrial uses; plans for site redevelopment as a hotel requires more stringent

14 (industrial) cleanup levels for TCE than previously anticipated."

15     62.    The Reopener Letter referenced site investigations by FPG that found

16 concentrations of TCE in groundwater had increased from 2004 levels. It also stated, "[a]dditional

17 environmental investigations are needed," and "additional remedial actions will be needed to

18 reduce contaminant concentrations for site redevelopment." The Reopener Letter  explained that

19 "FPG Development plans to construct a 9-story building with parking on the first four levels, and

20 hotel rooms on the top 4 levels." The Water Board thus required, under Water Code Section

21 13267, that SUMCO and Integris submit a site investigation work plan.

22     63.    FPG submitted a revised site investigation workplan, prepared by AWR, to the

23 Water Board in August 2019.

24     64.    On August 12, 2019, the Water Board provided its comments on AWR's revised

25 site investigation workplan.

26     65.    The Water Board noted that the reopener occurred because Integris and FPG

27 wanted the Deed Restriction removed to build the hotel. Specifically, the Water Board stated:

28     Section 1.4, 3rd paragraph, second sentence – the case was reopened at the RP's

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

12
COMPLAINT

Case No.  21-cv-472

request to remove the 1999 Deed Restriction – NOT at the request of the Water Board. This sentence should be revised to say…reopened for the Water Board to "evaluate a request to remove the 1999 deed restriction".

66.     On September 9, 2019, the Water Board directed SUMCO and Integris to submit a completion report by November 1, 2019. The letter stated, "[t]he information required in this report is needed to determine the current extent of the groundwater contamination plume and determine whether subsurface contamination poses a threat to human health through the vapor intrusion pathway."

67.     On September 13, 2019, AWR submitted a revised site investigation report, on behalf of Integris and FPG, to the Water Board.

68.     AWR's report stated that "[i]n October 2018 the case was reopened at the request of the RP for the Water Board to evaluate a request to remove the 1999 deed restriction."

69.     AWR found high levels of chlorinated volatile organic compounds ("CVOCs") in groundwater and soil vapor at the Property.

70.     On September 27, 2019, FPG sent SUMCO and Integris a demand that they "promptly respond to and perform as required" under the June 11, 2019 Water Board directive.

71.     On November 18, 2019, the Water Board directed Integris to submit a Risk Management Plan and SUMCO to submit a groundwater treatment plan for the Property by December 31, 2019.

72.     In that letter, the Water Board asserted that it considers SUMCO and Integris jointly and severally liable for site contamination and remediation regardless of any contractual obligations that exist between them, including any allocation of responsibility.

**SUMCO is Complying with the Water Board Directives**

73.     Since receiving the Reopener Letter, SUMCO has incurred expenses in dealing with the Water Board despite not being responsible for investigating or remediating the Property under the PSA.

74.     SUMCO retained legal counsel to communicate and negotiate with the Water Board.

75.     SUMCO also retained EKI Environment & Water, Inc., an environmental

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

13
COMPLAINT

Case No.  21-cv-472

1   consultant, to comply with the Water Board investigation requests to avoid an enforcement action.

2        76.     SUMCO's consultant sampled wells on September 22, 2020 and completed a

3   Groundwater Plan and Updated Feasibility Evaluation of Remedial Alternatives submitted to the

4   Water Board on November 20, 2020.

5        77.     In addition, SUMCO reimbursed and will continue to reimburse the Water Board

6   for oversight costs. For example, on January 10, 2020, after Integris refused to confirm whether it

7   had paid a $239.42 invoice from the Water Board, SUMCO paid the invoice under protest.

8        78.     The Water Board notified SUMCO that it expects to incur about $6,000 in

9   oversight costs from July 1, 2020 to June 30, 2021. The Water Board also notified SUMCO that it

10   intends to continue to recover expenses for overseeing site investigation and cleanup under

11   Section 13304 of the California Water Code.

12        79.     SUMCO has performed remedial obligations for which Integris is solely and

13   expressly responsible under the PSA.

14              **Integris Rejects SUMCO's Demand for Defense and Indemnity**

15        80.     SUMCO is not the owner of the Site and is not a party to the Deed Restriction.

16        81.     SUMCO complied with its remedial obligations under the PSA.

17        82.     SUMCO's responsibilities for the Property ceased on June 16, 2014 when the

18   Water Board determined no further action was required and issued the NFA.

19        83.     "Claims," including regulator demands, related to the presence of any remaining

20   contamination after the NFA was issued are the sole responsibility of Integris under the PSA.

21        84.     Integris agreed to indemnify and defend SUMCO from and against the "Claims"

22   from the Water Board and any other third parties.

23        85.     In letters dated September 30, October 8, November 21, and December 13, 2019,

24   SUMCO demanded that Integris defend and indemnify it against the Claims of FPG and the Water

25   Board, including payment of an invoice from the Water Board to SUMCO for oversight costs.

26        86.     Integris failed and refused to honor its defense and indemnity obligations to

27   SUMCO under the PSA.

28        87.     On December 26, 2019, attorney Brian T. Seltzer informed SUMCO that Integris

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

14
COMPLAINT

Case No.  21-cv-472

1    had no further interest in directly corresponding with SUMCO and that all further correspondence

2    about the Property should be directed to him. In a January 2, 2020 email, Seltzer confirmed that he

3    represents both Integris and FPG for this matter.

4         88.    On March 3, 2020, SUMCO invoked the dispute resolution process required under

5    Section 12.8 of the PSA by requesting in writing that Integris enter into good-faith negotiations to

6    attempt to resolve the parties' dispute regarding which party is responsible for the remedial

7    obligations.

8         89.    That letter stated that "Buyer has consistently failed and refused to honor its

9    defense and indemnity obligations under the Purchase and Sale Agreement. Consequently,

10   SUMCO has incurred damages and is threatened with further losses, liabilities, and damages."

11        90.    The letter also stated "[a]s a consequence of Buyer's failure and refusal to honor its

12   defense and indemnity obligations SUMCO has incurred damages, including attorneys' fees, and

13   faces the threat of further enforcement action by the Regional Water Quality Control Board."

14        91.    The letter specifically invoked the dispute resolution process, as follows:

15       Pursuant to section 12.8 of the Purchase and Sale Agreement we hereby request that
16       Buyer engage in good faith negotiations to resolve these disputes, including without
         limitation, by: (1) responding to this notice and request by setting out in writing
17       Buyer's reasons for failing and refusing to defend and indemnify SUMCO against
         the Executive Officer's and State Board's demands, together with the sequence of
18       subordinate facts leading to its conclusion or course of action; and (2) meeting to
         discuss the parties' disputes. Under section 12.8(b) of the Purchase and Sale
19       Agreement, the parties must meet within 10 days of this notice. Please advise us of
         Buyer's intent without delay, so we can schedule the meeting within the time
20       required. If Buyer fails to comply with the dispute resolution requirements under
         the Purchase and Sale Agreement we intend to file a lawsuit to enforce SUMCO's
21       rights.

22        92.    The letter made clear that SUMCO would be forced to bring a lawsuit if Integris

23   did not participate in the dispute resolution process: "If we are not able to resolve this matter under

24   the contractual procedures, SUMCO has authorized us to commence suit to secure all available

25   relief."

26        93.    Integris did not respond to SUMCO's request to enter into good-faith negotiations

27   in violation of the dispute resolution provisions of the PSA.

28        94.    Integris did not comply with the monitoring obligations and other obligations

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

15
COMPLAINT

Case No.  21-cv-472

imposed by the Deed Restriction, Risk Management Plan, NFA, and case closure summary.

95.     SUMCO has incurred and will continue to incur remedial costs, including attorneys' fees, because of Integris's actions and omissions, including its breach of the PSA.

## FIRST CAUSE OF ACTION

### Breach of Contract

96.     SUMCO incorporates by reference, as if set forth in full, all previous allegations.

97.     The PSA is a valid and enforceable contract between SUMCO and Integris.

98.     SUMCO performed all of its obligations under the PSA.

99.     The claims and demands made by FPG and the Water Board constitute "Claims" for which Integris must defend and indemnify SUMCO under the PSA.

100.    Integris breached its obligation to SUMCO under the PSA by, among other things, refusing and failing to indemnify and defend SUMCO against the claims and demands of the Water Board and FPG.

101.    Integris breached its obligations to SUMCO under the PSA by refusing to engage in the mandated dispute resolution process.

102.    Because of Integris' breach, SUMCO was forced to (1) retain legal counsel to communicate and negotiate with the Water Board; (2) hire an environmental consultant;  (3) conduct another environmental investigation to comply with the Water Board's request and to avoid enforcement action; and (4) retain legal counsel to file this lawsuit.

103.    In addition, Integris' disregard of its obligations under the Deed Restriction, Risk Management Plan, NFA, and case closure summary may have contributed to an increase in the costs incurred by SUMCO.

104.    As a direct and proximate result of Integris' breaches of the PSA, SUMCO has suffered and continues to suffer damages and loss, including remediation costs, in an amount to be proven at trial, which exceed $75,000, exclusive of interest and costs.

## SECOND CAUSE OF ACTION

### Recovery Under Section 107(a) of CERCLA

105.    SUMCO incorporates by reference, as if set forth in full, all previous allegations.

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

16

COMPLAINT

Case No.  21-cv-472

106.     Integris is the owner of the Property and thus a potentially responsible party ("PRP") as defined by CERCLA, 42 U.S.C. §§ 9601, et seq.

107.     Section 107(a) of CERCLA allows cost recovery by "any other person" who has incurred costs to remediate property contaminated with hazardous substances.

108.     The Property is a "facility" as defined under CERCLA because it is a site where hazardous substances are present because of industrial operations.

109.     There has been a release of hazardous substances because VOCs have been found in groundwater samples from the Property and VOCs constitute "hazardous substances" under Section 101 of CERCLA (42 U.S.C. § 9601(14) and (22)).

110.     SUMCO has incurred necessary costs and expenses in response to the Water Board's requirement that SUMCO investigate and remediate the Property to address contaminated groundwater, including consultant fees, oversight costs billed by the Water Board to SUMCO, and investigation costs.

111.     These costs and expenses are necessary based on an actual and real threat to public health and the environment and are consistent with the National Contingency Plan ("NCP"), within the meaning of 42 U.S.C. § 9607(a) and 40 C.F.R. § 300, et seq.

112.     Under the PSA, Integris agreed to assume full responsibility for environmental contamination at the Site once the NFA was issued and did so with full knowledge of the nature and extent of contamination at the Site.

113.     Integris did not comply with its obligations under the Deed Restriction, Risk Management Plan, NFA, and case closure summary.

114.     SUMCO is not a party to the Deed Restriction and the cause of the regulatory reopener at the Site was the decision by Integris to build a hotel in contravention of the Deed Restriction.

115.     Under Section 107 of CERCLA, Integris is liable for any present and future costs incurred by SUMCO for the investigation and remediation of the Property and must indemnify SUMCO for any such costs incurred.

/ / /

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

17
COMPLAINT

Case No.  21-cv-472

**THIRD CAUSE OF ACTION**

**In the Alternative, Recovery Under Section 113(f) of CERCLA**

116.    SUMCO incorporates by reference, as if set forth in full, all previous allegations.

117.    Integris is the owner of the Property and thus is a PRP under CERCLA.

118.    The Property is a "facility" as defined under CERCLA because it is a site where hazardous substances are present because of industrial operations.

119.    There has been a release of hazardous substances because VOCs have been found in groundwater samples from the Property and VOCs constitute "hazardous substances" under Section 307(a) of the Federal Water Pollution Control Act (33 U.S.C. § 1317(a)(1)).

120.    SUMCO has incurred reasonable and necessary costs and expenses in response to the Water Board's requirement that SUMCO investigate and remediate the Property to address contaminated groundwater flowing to the Property including consultant fees, "oversight" costs billed by the Water Board to SUMCO, and investigation costs.

121.    These costs and expenses are reasonable and necessary based on an actual and real threat to public health and the environment and are consistent with the NCP.

122.    Under the PSA, Integris agreed to assume full responsibility for environmental contamination at the Site once the NFA was issued and did so with full knowledge of the nature and extent of contamination at the Site.

123.    SUMCO is not a party to the Deed Restriction and the cause of the regulatory reopener was the decision by Integris to build a hotel in contravention of the Deed Restriction.

124.    Integris did not comply with its obligations under the Deed Restriction, Risk Management Plan, NFA, and case closure summary.

125.    In the alternative to SUMCO's Second Cause of Action, under Section 113(f) of CERCLA Integris is severally liable in contribution for its equitable share of any present and future costs incurred by SUMCO for the investigation and remediation of the Property and for any present and future costs incurred by SUMCO for the investigation and remediation of the Property.

/ / /

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

18
COMPLAINT

Case No.  21-cv-472

**FOURTH CAUSE OF ACTION**

**Recovery for Response Costs under Section 25363 of the**
**Carpenter-Presley-Tanner Hazardous Substance Account Act, Cal. Health & Safety Code**

126.     SUMCO incorporates by reference, as if set forth in full, all previous allegations.

127.     Integris is the owner of the Property and thus is a "responsible party" or "liable person" as defined by Section 25323.5(a) of the Carpenter-Presley-Tanner Hazardous Substance Account Act, Cal. Health & Safety Code § 25300 et seq. ("HSAA").

128.     Section 25363(e) of HSAA provides that "any person" who incurred costs to remediate property contaminated with hazardous substances may seek contribution or indemnity from any person liable under HSAA.

129.     The Property is a "site" under Section 25323.9 of HSAA, which has the same meaning as "facility" as defined under CERCLA, because it is a site where hazardous substances are present because of industrial operations.

130.     There has been a release of hazardous substances because VOCs have been found in groundwater samples from the Property and VOCs constitute "hazardous substances" under Section 25316 of HSAA.

131.     SUMCO has incurred necessary costs and expenses in response to the Water Board's requirement that SUMCO investigate and remediate the Property to address contaminated groundwater, including consultant fees, oversight costs billed by the Water Board to SUMCO, and investigation costs.

132.     These costs and expenses are necessary based on an actual and real threat to public health and the environment and are consistent with the NCP, within the meaning of Cal. Health & Safety Code § 25350, 42 U.S.C. § 9607(a), and 40 C.F.R. § 300, et seq.

133.     Under the PSA, Integris agreed to assume full responsibility for environmental contamination at the Site once the NFA was issued and did so with full knowledge of the nature and extent of contamination at the Site.

134.     Integris did not comply with its obligations under the Deed Restriction, Risk Management Plan, NFA, and case closure summary.

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

19
COMPLAINT

Case No.  21-cv-472

135. SUMCO is not a party to the Deed Restriction and the cause of the regulatory reopener at the Site was the decision by Integris to build a hotel in contravention of the Deed Restriction.

136. Under Section 25363 of the HSAA (Cal. Health & Safety Code § 25363), Integris is liable for any present and future costs incurred by SUMCO for the investigation and remediation of the Property and must indemnify SUMCO for or contribute towards the costs incurred.

## FIFTH CAUSE OF ACTION

### Declaratory Relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 and Fed. R. Civ. P. 57

137. SUMCO incorporates by reference, as if set forth in full, all previous allegations.

138. An actual justiciable controversy exists under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 because the 1998 Purchase Agreement obligates Integris to defend and indemnify SUMCO and Integris has failed and refused to do so.

139. In addition to and without limiting all other rights and remedies to which SUMCO is entitled in this action, SUMCO seeks entry of a declaratory judgment that:

(a) the 1998 Purchase Agreement is a valid and enforceable contract;

(b) under the PSA, Integris must defend and indemnify SUMCO against any claims related to the Property once the NFA was issued, including for all present and future costs incurred by SUMCO relating to the investigation and remediation of the Property; and

(c) Integris must specifically perform its defense and indemnity obligations under the PSA.

140. This declaration is necessary and appropriate under the circumstances so that SUMCO and Integris may determine their rights and obligations in the PSA and otherwise.

141. A declaratory judgment will terminate the controversy giving rise to this action.

## SIXTH CAUSE OF ACTION

### In the Alternative, Common Law Equitable Indemnity

142. SUMCO incorporates by reference, as if set forth in full, all previous allegations.

143. Integris, as the owner of the Property where there has been a release of hazardous

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

20
COMPLAINT

Case No.  21-cv-472

1    substances, is liable for all remediation and related costs incurred by SUMCO.

2         144.    SUMCO is not a party to the Deed Restriction and the cause of the regulatory

3    reopener was the decision by Integris to build a hotel in contravention of the Deed Restriction.

4         145.    Integris did not comply with its obligations under the Deed Restriction, Risk

5    Management Plan, NFA, and case closure summary.

6         146.    Integris is equitably responsible for any investigation and remediation costs for the

7    Property.

8         147.    Integris, as the owner of the Property, has failed and refused to indemnify SUMCO

9    for such costs.

10        148.    SUMCO has incurred and will continue to incur investigation and remediation

11   costs for which Integris is responsible in full.

12                          **SEVENTH CAUSE OF ACTION**

13                  **In the Alternative, Equitable Contribution**

14        149.    SUMCO incorporates by reference, as if set forth in full, all previous allegations.

15        150.    The Water Board has demanded and required that both SUMCO and Integris

16   investigate and remediate the Property, which creates a joint and several obligation between

17   SUMCO and Integris.

18        151.    Integris, as the owner of the Property, must contribute its equitable share of all

19   costs of remediation of the Property.

20        152.    SUMCO is entitled to equitable contribution from Integris under California Civil

21   Code § 1432, which provides that a party to a joint and several obligation, who satisfies more than

22   its share of the claim against all, may require a proportionate contribution from all the parties

23   joined with it.

24        153.    Integris has failed and refused to accept responsibility for its obligations regarding

25   the Property.

26        154.    SUMCO has incurred and will continue to incur investigation and remediation

27   costs, for which Integris must contribute in whole or in part.

28   / / /

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

21
COMPLAINT

Case No.  21-cv-472

# REQUEST FOR RELIEF

For these reasons, Plaintiff demands judgment in its favor and against Defendant, as follows:

A. Damages including recovery of remediation and related costs for the Property in an amount to be determined at trial;

B. A declaratory judgment against Integris;

C. An award of SUMCO's reasonable attorneys' fees and costs under the PSA and Ca. Civ. Pro. § 1021.5 or as otherwise provided by law or in equity;

D. Pre-judgment interest at the maximum rate, whether at law or in equity.

E. Post-judgment interest at the maximum rate, whether at law or in equity.

F   Any further relief that the Court may find just and equitable.


DATED:  January 20, 2021                BERKES CRANE ROBINSON & SEAL LLP


By:  ____/s/ Peter J. Marcus_____
         PETER J. MARCUS
         LAURIE S. JULIEN
         Attorneys for Plaintiff,
         SUMCO PHOENIX CORPORATION


DATED:  January 20, 2021                HUSCH BLACKWELL


By:  ____/s/ Jason B. Heep, *Pro Hac Vice Pending*____
         SCOTT DAVIS, *Pro Hac Vice Pending*
         JASON B. HEEP, *Pro Hac Vice Pending*
         KAREN L. TIDWALL, *Pro Hac Vice Pending*
         Attorneys for Plaintiff,
         SUMCO PHOENIX CORPORATION

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

22
COMPLAINT

Case No.  21-cv-472

**PLAINTIFF'S DEMAND FOR JURY TRIAL**

Plaintiff SUMCO Phoenix Corp. demands a jury trial on every cause of action set forth here.

DATED:  January 20, 2021                BERKES CRANE ROBINSON & SEAL LLP

By:        /s/ Peter J. Marcus
           PETER J. MARCUS
           LAURIE S. JULIEN
           Attorneys for Plaintiff,
           SUMCO PHOENIX CORPORATION

DATED:  January 20, 2021                HUSCH BLACKWELL

By:        /s/ Jason B. Heep, *Pro Hac Vice Pending*
           SCOTT DAVIS, *Pro Hac Vice Pending*
           JASON B. HEEP, *Pro Hac Vice Pending*
           KAREN L. TIDWALL, *Pro Hac Vice Pending*
           Attorneys for Plaintiff,
           SUMCO PHOENIX CORPORATION

64I0508.DOCX

LAW OFFICES
BERKES CRANE
ROBINSON & SEAL
LLP

23
COMPLAINT

Case No.  21-cv-472

# EXHIBIT 1

# PURCHASE AND SALE AGREEMENT

between

## MITSUBISHI SILICON AMERICA
a California Corporation

(Seller)

and

## INTEGRIS/MILLENNIUM JOINT VENTURE
a California limited liability company

(Buyer)

October 23, 1998

MSA S CRYSTAL

S0331S6590

# TABLE OF CONTENTS

|  | Page |
|---|---|
| ARTICLE I  PROPERTY TO BE CONVEYED AND PURCHASED | 2 |
| ARTICLE II  PURCHASE PRICE | 2 |
| 2.1  Purchase Price | 2 |
| 2.2  Payment of Purchase Price | 3 |
| 2.3  Investment of Deposit; Timeliness of Deposit | 3 |
| 2.4  Deposit as Liquidated Damages | 4 |
| ARTICLE III  AS IS | 4 |
| 3.1  "As-Is" Sale | 5 |
| 3.2  Release of Seller | 8 |
| 3.3  Inspection | 8 |
| 3.4  Permits and Entitlements | 8 |
| 3.5  Releasee's Indemnit | 9 |
| ARTICLE IV  TITLE TO PROPERTY | 9 |
| 4.1  Title | 9 |
| 4.2  Title to Personal Property and Contracts | 9 |
| HAZARDOUS MATERIALS REMEDIATION WORK | 9 |
| 5.1  Feasibility Study/Remedial Action Plan | 11 |
| 5.2  Insurance Policy | 12 |
| ARTICLE VI  BUYER'S AND SELLER'S CONDITIONS TO CLOSING | 12 |
| 6.1  Buyer's Conditions To Closing | 15 |
| 6.2  Seller's Conditions To Closing | 15 |
| ARTICLE VII  CLOSING | 15 |
| 7.1  Deposit with Escrow Holder | 15 |
| 7.2  Closing | 16 |
| 7.3  Delivery by Seller | 16 |
| 7.4  Delivery by Buyer | 17 |
| 7.5  Other Instruments | 17 |
| 7.6  Close of Escrow | 17 |
| 7.7  Prorations and Apportionments | 17 |
| 7.8  Payment of Adjustments to Proration | 17 |
| 7.9  Costs and Expenses | 18 |
| 7.10  Insurance; Utilities | 18 |
| ARTICLE VIII  REPRESENTATIONS, WARRANTIES AND COVENANTS | 18 |
| 8.1  Buyer's Representations | 18 |
| 8.2  Seller's Representations | 19 |
| 8.3  Limitation on Liability | 20 |
| ARTICLE IX  POSSESSION | 20 |
| ARTICLE X  OPERATION OF THE PROPERTY | 20 |
| ARTICLE XI  LOSS BY FIRE OR OTHER CASUALTY; CONDEMNATION | 20 |
| 11.1  Damage or Destruction | 21 |
| 11.2  Condemnation | 21 |
| ARTICLE XII  MISCELLANEOUS | 21 |
| 12.1  Notices | 22 |
| 12.2  Brokers and Finders | 22 |
| 12.3  Successors and Assigns | 22 |
| 12.4  Amendments | 22 |

026

MSA S CRYSTAL    50331565590

12.5  Interpretation......................................................................................22
12.6  Governing Law......................................................................................22
12.7  Merger of Prior Agreements. .................................................................22
12.8  Disputes ...............................................................................................25
12.9  Survival.................................................................................................25
12.10  Time of the Essence...........................................................................25
12.11  Confidentiality. ..................................................................................25
12.12  No Waiver............................................................................................25
12.13  Further Acts. .......................................................................................25
12.14  Agreement Not to Benefit Third Parties...............................................25
12.15  Severability.........................................................................................25
12.16  Damages..............................................................................................25
12.17  Counterparts........................................................................................26
12.18  Survival of Representations and Warranties. ......................................26
12.19  Form 1099-S. .......................................................................................26
12.20  Alquist-Priolo Special Studies Zones Act............................................26
12.21  Commercial Property Earthquake Weakness Disclosure Report ............26

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "Agreement") is made as of October 23, 1998 (the "Agreement Date"), by and between MITSUBISHI SILICON AMERICA, a California corporation ("Seller") and INTEGRIS/MELLENIUM JOINT VENTURE, a California limited liability company ("Buyer"), with reference to the following facts:

A. Seller owns the fee interest in that certain real property commonly known as 3705, 3715 and 3723 Haven Avenue, Menlo Park, California, consisting of approximately 2.489 acres of land (the "Land") and as more particularly described in the form of Grant Deed in Exhibit A attached hereto and made a part hereof (the "Deed"), together with:

(1) All right, title, interest of Seller, in and to all easements, rights-of-way, gaps, strips and gores of land, streets, ways, alleys, development rights, sewers, sewer rights, waters, water courses, water rights, privileges, licenses, tenements, hereditaments, and appurtenances whatsoever, in any way appertaining to the Land, and the rights of Seller in and to the benefits of any conditions, covenants, and restrictions now or hereafter affecting the Land ("Appurtenant Rights to Land"); and

(2) Except to the extent of the personal property, trade fixtures, and equipment owned by existing tenants, all things now or hereafter affixed to the Land, including all buildings, structures, and improvements of every kind and description now or hereafter erected or placed thereon, any fixtures and any and all machinery, motors, elevators, boilers, equipment (including, without limitation, all equipment for the generation or distribution of air, water, heat, electricity, light, fuel, or refrigeration or for ventilating or air conditioning purposes or for sanitary or drainage purposes or for the removal of dust, refuse, or garbage), and other property of every kind and description now or hereafter placed, attached, affixed, or installed in such buildings, structures, or improvements and all hereafter placed, repairs, additions, accessions, or substitutions or proceeds thereto or therefor (collectively referred to as the "Improvements"). The Land, Appurtenant Right to Land and Improvements are collectively referred to herein as the "Real Property".

(3) Certain intangible property owned by Seller and used in the ownership, occupancy, operation or maintenance of the Real Property, or any portion of either, including, but not limited to, licenses, permits, certificates and franchises issued by any federal, state or local authorities relating to the use, maintenance, occupancy or operation of the Real Property; reports and studies which concern, directly or indirectly, in any manner whatsoever, the physical condition of the Real Property and any constraints on development of the Real Property, plans and specifications, appraisals, title reports, correspondence, surveys, and any other documented information relating exclusively to the Real Property; all rights and claims against all parties (other than Seller) and their insurers and Seller's insurers, relating to contamination upon, from, below, into or on the Real Property; any and all warranties, telephone exchange numbers, architectural or engineering plans and specifications, and development rights that exist as of the Closing Date (as defined below) and relate to the Real Property; any and all rights to the name of improvements upon the Real Property; and any and all escrow accounts, insurance policies, deposits, instruments and business records pertaining to the use, maintenance, occupancy or operation of the Real Property; but not including any intangible property which Seller reasonably deems to be privileged or proprietary or which is specifically excluded herein (collectively, the "Intangible Property"). The Intangible Property is to be conveyed pursuant to an assignment in the form of Exhibit B hereto (the "Assignment of Intangibles").

(4) Certain tangible property owned by Seller and used in the ownership, occupancy, operation or maintenance of the Real Property owned by Seller (together with the Intangible Property hereinafter defined (the "Personal Property") described in the form of Bill of Sale attached as Exhibit C hereto (the "Bill of Sale")

(5) The Real Property, Intangible Property, Personal Property are collectively referred to in this Agreement as the "Property."

B. The Property is currently improved with three (3) office/warehouse buildings located on two assessor's parcels. Assessor's Parcel No. 055-170-240 is improved with a building containing approximately 10,361 square feet of space ("Building 1"). Assessor's Parcel No. 055-170-250 is improved with two buildings, one contains approximately 17,704 square feet of space ("Building 2"), the other contains approximately 13,675 square feet of space ("Building 3"). Seller makes no representation or warranty with respect to the size of Building 1, Building 2, or Building 3.

C. Buyer desires to purchase from Seller and Seller desires to sell to Buyer such property on the terms and conditions set forth herein.

NOW, THEREFORE, IN CONSIDERATION of the foregoing and the mutual agreements herein set forth, and other valuable consideration, receipt of which is hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE I
## PROPERTY TO BE CONVEYED AND PURCHASED

1.1 Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase from Seller, subject to the terms and conditions set forth herein, the Property.

1.2 Buyer acknowledges and agrees that pursuant to the provisions set forth hereinbelow, Seller shall have the right to (i) demolish the Improvements consisting of or within Building 2, and (ii) demolish or remove all underground storage tanks, prior to or after the Closing Date (as defined below), and that such demolition or removal shall not affect the Purchase Price (as defined below) or any rights or obligations of Buyer or Seller under this Agreement.

## ARTICLE II
## PURCHASE PRICE

1.1 Purchase Price. The purchase price (the "Purchase Price") for the Property shall be the sum of Two Million Three Hundred Eighty-five Thousand Dollars ($2,385,000).

1.2 Payment of Purchase Price. The Purchase Price shall be paid as follows:

//

//

//

//

**029**

**(a)** Initial Deposit.   Within two (2) business days of the Agreement Date,  Buyer shall deliver to:

Chicago Title Insurance Company
1001 Marshall Street, Suite 101
Redwood City, CA  94063

(hereafter referred to as the "Escrow Holder" or "Title Company"), the sum of Twenty-five Thousand Dollars ($25,000) as a deposit towards the Purchase Price (the "**Deposit**").  The Deposit shall be released to Seller by Escrow Holder on the first business day after the Approval Date (as defined below) unless this Agreement is terminated by Buyer in accordance with the provisions of Section 6.1.

**(b)** Payment of the Purchase Price.  On the Closing Date, a sum equal to the Purchase Price, adjusted by prorations and costs of escrow as provided in Sections 7.7, 7.8, 7.9 and 7.10, and less the Deposit (and if applicable, the Extension Payment No. 1 and Extension Payment No. 2 (as such phrases are defined below)) will be paid by Buyer by wire transfer or cashier's check into escrow in immediately available Federal funds as set forth in Section 7.6.

2.3   Investment of Deposit; Timeliness of Deposit.   Escrow Holder shall place the Deposit in an interest-bearing escrow account as directed by Buyer.  All interest on the Deposit shall accrue for the benefit of the recipient of the Deposit.  All references to the Deposit in this Agreement shall be deemed to include both the principal amount deposited by Buyer and all interest accruing thereon.  If Buyer purchases the Property, in accordance with the provisions of this Agreement, the Deposit shall apply towards the Purchase Price.  The failure of Buyer to timely deliver any Deposit hereunder shall be a material default and shall entitle Seller, at Seller's sole option, to terminate this Agreement immediately.

2.4   Deposit as Liquidated Damages   FROM AND AFTER THE DATE HEREOF, IN THE EVENT THE SALE OF THE PROPERTY AS CONTEMPLATED HEREUNDER IS NOT CONSUMMATED BECAUSE OF A DEFAULT UNDER THIS AGREEMENT ON THE PART OF BUYER, THE DEPOSIT(S) (INCLUDING ALL INTEREST EARNED FROM THE INVESTMENT THEREOF) SHALL BE PAID TO AND RETAINED BY SELLER AS LIQUIDATED DAMAGES.  THE PARTIES ACKNOWLEDGE THAT SELLER'S ACTUAL DAMAGES IN THE EVENT THAT THE SALE IS NOT CONSUMMATED WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE.  THEREFORE, BY SEPARATELY EXECUTING THIS SECTION 2.4 BELOW, THE PARTIES ACKNOWLEDGE THAT THE DEPOSIT(S) HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF SELLER'S DAMAGES AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER IN THE EVENT THE CLOSING (AS DEFINED IN SECTION 7.2 HEREIN) DOES NOT OCCUR BECAUSE OF BUYER'S DEFAULT HEREUNDER AND AS SELLER'S SOLE AND EXCLUSIVE REMEDY AGAINST BUYER ARISING FROM SUCH DEFAULT BY BUYER. NOTWITHSTANDING THE FOREGOING, IN NO EVENT SHALL THIS SECTION 2.4 LIMIT THE DAMAGES RECOVERABLE BY EITHER PARTY AGAINST THE OTHER PARTY DUE TO (A) THE OTHER PARTY'S OBLIGATION TO INDEMNIFY SUCH PARTY IN ACCORDANCE WITH THIS AGREEMENT, OR (B) THIRD PARTY CLAIMS.  IN ADDITION, IN THE EVENT THE SALE OF THE PROPERTY AS CONTEMPLATED HEREUNDER IS NOT CONSUMMATED BECAUSE OF A DEFAULT UNDER THIS AGREEMENT ON THE PART OF BUYER, BUYER SHALL PAY ALL TITLE,

SURVEY AND ESCROW CANCELLATION CHARGES. BY SEPARATELY EXECUTING THIS SECTION 2.4 BELOW, BUYER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTOOD THE ABOVE PROVISION COVERING LIQUIDATED DAMAGES, AND THAT IT WAS REPRESENTED BY COUNSEL WHO EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME THIS AGREEMENT WAS EXECUTED.

**MITSUBISHI SILICON AMERICA,**
a California corporation

By: _____
Name: _____Krishna Rao_____
Title: ____Chief Financial Officer____

**INTEGRIS/MILLENNIUM JOINT VENTURE,** a California Limited Liability company

By: _____Integris_____
A _____Shareholder_____

By: _____
Name: __Loren Baxter_____
Title: __Sole Owner_____

## ARTICLE III
## "AS IS" SALE; INSPECTION

3.1 "As-Is" Sale.    Buyer acknowledges that prior to the Closing Date, it or its agents will have inspected the Property and investigated and observed the physical characteristics and condition of the Property.  Except as set forth in Article V and except for any breach of an express representation or warranty set forth in Section 8.2, upon acceptance of the delivery of the Deed Buyer shall be deemed to have waived (with respect to Seller) any and all defects in the physical characteristics and condition of the Property.  Buyer further acknowledges that, except as expressly set forth in Article V and in Section 8.2, neither Seller nor any of Seller's employees, agents, representatives or contractors have made any representations, warranties or agreements, express or implied, by or on behalf of Seller as to any matters concerning the Property including, without limitation, compliance with any laws, rules or regulations including seismic regulations (e.g., building structural and interior improvements), energy conservation (e.g., Title 24), or employee access (e.g., The Americans With Disability Acts).  Buyer acknowledges and agrees that, except as expressly set forth herein, the Property is to be purchased, conveyed and accepted by Buyer in its present condition "AS IS" and that, except as expressly set forth herein, no patent or latent defect in condition of the Property, whether or not known or discovered, shall affect the rights of either party hereto.  Any documents furnished to Buyer by Seller relating to the Property, including, without limitation, maps, surveys and other information shall be deemed furnished as a courtesy to Buyer but without warranty from Seller, except as expressly set forth herein.  Notwithstanding the foregoing, Seller agrees to deliver to Buyer true and correct complete copies of the FS/RAP (as defined in Section 5.1 below). All work done in connection with preparing the Property for the uses intended by Buyer including any and all fees, studies, reports, approvals, plans, surveys, permits, and any expenses whatsoever necessary or desirable in connection with Buyer's acquiring, developing, using and/or operating the Property shall be obtained and paid for by, and shall be the sole responsibility of Buyer.

3.2    Release of Seller.    Except with respect  to the representations and warranties set forth in Section 8.2, and all of Seller's obligations under Section 5.1, Buyer hereby irrevocably and unconditionally releases and forever discharges Seller and Seller's officers, directors, employees, agents, contractors, successors, assigns, executors  and administrators, agents, employees,

representatives, attorneys, affiliates and all persons acting by, through, under or in concert with any of them (the "Releasees"), from all Claims.  The term "Claims" shall mean: all obligations, liabilities, claims (including sums paid in settlement of claims), demands, damages, actions, administrative proceedings (including informal proceedings), judgments, losses, fines, taxes, assessments, costs and expenses, including attorneys' fees, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, which the claimant (whether such claimant is Buyer or any third party) now has, owns or holds, or claims to have, own or hold, or at any time heretofore had owned, held, or claimed to have had, owned or held, against the Releasees, Seller or any third party, arising out of or related to:

(i) the physical condition of the Property, including, without limitation, the presence, generation, treatment, removal or disposition of Hazardous Materials (hereinafter defined in this Section 3.2) on, under or at the Property or any part thereof;

(ii) any governmental laws and regulations to which the Property may be subject, including, but not limited to, Environmental Laws (hereinafter defined) zoning and land use laws and regulations;

(iii) Buyer's contemplated use and/or development of the Property;

(iv) the Improvements or the construction of any new improvements;

(v) third party claims for personal injury or real or personal property damage;

(vi) the content or accuracy of any report, study, opinion or conclusion of any soils, toxic, environmental or other engineer or other person or entity who has investigated or examined the Property or any aspect thereof;

(vii) the content or accuracy of any information released to Buyer by an engineer or planner in connection with the development of the Property;

(viii) the availability of building or other permits or approvals for the Property by any state or local governmental bodies with jurisdiction over the Property;

(ix) any of the items delivered to Buyer pursuant to Buyer's review of the condition of the Property;

(x) the content or accuracy of any other development or construction cost, projection, financial or marketing analysis or other information given to Buyer by Seller or reviewed by Buyer with respect to the Property;

(xi) the cost of remediating existing and future Hazardous Materials present or released on, in, or into the air, soil, groundwater, surface water, or improvements at, on, about, under, or within the Property at actionable levels under Environmental Laws;

(xii) third party claims attributable to the cost of remediating existing and future Hazardous Materials present or released on, in, or into the soil, groundwater, surface water, or improvements at, on, under, or within the Property at actionable levels under the law; and

032

50331565590

(xiii) third party claims for property damage and bodily injury attributable to existing and future Hazardous Materials present or released on, in, or into the soil, groundwater, surface water, or improvements at, on, under, or within the Property at actionable levels under the law; and

(xiv) third party claims for remediation costs and bodily injury attributable to Hazardous Materials present or released on, in, or into the soil, groundwater, surface water, or improvements at, on, about, under, or within other real property at actionable levels under Environmental Laws that emanate from the Property after the date Seller completes the work described in the FS/RAP.

Notwithstanding any provision herein to the contrary, Claims shall not include (i) third party claims for remediation costs and bodily injury attributable to Hazardous Materials present or released on, in, or into the soil, groundwater, surface water, or improvements at, on, about, under, or within other real property at actionable levels under Environmental Laws that emanate from the Property prior to the date Seller completes the work described in the FS/RAP; and (ii) third party claims arising from the disposal of contaminated dirt taken from the Property (or other real property) in connection with the completion of the work described in the FS/RAP by Seller or by persons working on behalf of Seller in violation of Environmental Laws.

EXCEPT WITH RESPECT TO THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 8.2, AND SELLER'S OBLIGATIONS UNDER SECTION 5.1, BUYER EXPRESSLY WAIVES ANY OF ITS RIGHTS GRANTED UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

As used herein, the term "Hazardous Materials" shall include any substance, chemical or mixture which is (or which contains any substance, chemical, compound, or mixture which is):

(i) a "Hazardous Substance," "Hazardous Material," "Hazardous Waste," or "Toxic Substance" under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. section 9601, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. section 1801, et seq. or the Solid Waste Disposal Act, 42 U.S.C. section 6901, et seq., including any regulations promulgated thereunder as any of the foregoing may be amended;

(ii) an "Acutely Hazardous Waste," "Extremely Hazardous Waste", under section 25110.02, 25115, 25117 or 25122.7 of the California Health and Safety Code, or is listed pursuant to section 25140 of the California Health and Safety Code, as any of the foregoing may be amended;

(iii) a "Hazardous Material", "Hazardous Substance" or "Hazardous Waste" under section 25281, 25316, 25501, or 25501.1 of the California Health and Safety Code, as any of the foregoing may be amended;

(iv) "Oil" or a "Hazardous Substance" under section 311 of the Federal Water Pollution Control Act, 33 U.S.C. section 1321, as may be amended, as well as any other hydrocarbonic substance, fraction, distillate or by-product;

(v) defined, identified or listed as an "Acutely Hazardous Waste," "Extremely Hazardous Material", "Extremely Hazardous Water", "Hazardous Constituents", or "Toxic Waste" pursuant to Division 4.5, Chapters 10 or 11 of Title 22 of the California Code of Regulations, as may be amended;

(vi) listed by the State of California as a chemical known by the State to cause cancer or reproductive toxicity pursuant to Section 25249.8 of the California Health and Safety Code, as may be amended;

(vii) a "Biohazardous Waste", "Medical Waste", or "Mixed Waste" under Section 25020.5, 25023.2 of the California Health and Safety Code, as may be amended;

(viii) a material which, due to its characteristics or interaction with one or more other substances, wastes, chemicals, compounds or mixtures, damages, or threatens to damage health, safety, or the environment, or is required by any law or public entity to be remediated, including remediation which such law or public agency requires in order for the property to be put to any lawful purpose;

(ix) regulated by any other federal, state or local statute, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, or asbestos, as now or at any time hereinafter in effect or any other hazardous, toxic or dangerous waste, substance or material; or

(x) hazardous, toxic, ignitable, radioactive, corrosive, or reactive and which is regulated by any public entity or under any law.

As used herein, the term "Environmental Laws" shall mean any and all present and future federal, state and local law (whether under common law, statute, rule, ordinance, agreement, regulation or otherwise), requirement under any permit issued with respect thereto, and other requirements of agencies having jurisdiction thereunder relating to the protection of human health or the environment, or the Hazardous Materials including, without limitation, the use, handling, transportation, production, disposal, treatment, discharge or storage thereof, including (without limitation) the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§136, et seq.; [sic] the Toxic Substances Control Act, 15. U.S.C. §§ 2601 et seq.; Federal Asbestos Hazard Emergency Response Act, 15 U.S.C. §§ 2641 et seq.; California Health & Safety Code §25915 et seq. (the "Connelly Act"); California Health & Safety Code § 25359.7; California Health & Safety Code §§ 2595 et seq.; California Labor Code §§ 6501.5 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601, et seq.), as heretofore or hereafter amended; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq. the Federal Water Pollution Prevention and Control Act, 33 U.S.C. §§ 1251 et seq.; the California Hazardous Waste Control Act, Health & Safety Code §§ 25100 et seq.; the California Hazardous Substance Account Act, California Health & Safety Code §§ 25300 et seq.; the California Safe Drinking Water and Toxic Enforcement Act, California Health & Safety Code §§ 25249.5, et seq. ("Proposition 65"); the California Hazardous Waste Management Act, California Health & Safety Code §§ 25170.1 et seq.; the California Health & Safety Code §§ 25501 et seq. (Hazardous Materials Response Plans and Inventory); the California Porter-Cologne Water Control Act, Water Code §§ 13000 et seq.; the California Health & Safety Code §§ 25280, et seq. (Underground Storage of Hazardous Substances), the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801, et seq.; the Solid Waste Disposal

Page 7

Act, 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1321; 42 U.S.C. §§ 7401 et seq. (the "Clean Air Act") and Title 22 of the California Code of Regulations.

3.3 <u>Inspection</u>. Seller hereby grants to Buyer and its representatives (including architects, surveyors and engineers) a license to enter upon, survey and conduct non-invasive inspections and tests of the Property, but such inspections and tests shall not damage the Property in any material respect and shall be conducted only after giving 24 hours prior notice to Seller. Any entry by Buyer onto the Property shall be in such a manner as to minimize interference with the operation and occupancy of the Property. Buyer shall promptly restore the Property to its condition prior to any such inspections and/or tests. Seller reserves the right to accompany Buyer during any inspection or test of the Property. To the extent permitted by law, Buyer shall protect, defend and indemnify Seller and hold Seller harmless against any and all liability, claims, loss, cost, damage or expense (including attorneys' fees) which Seller may sustain or incur by reason of or in connection with any such entry, inspections or tests. If this Agreement is terminated, Buyer shall deliver to Seller within 3 days of such termination, without charge therefor, the results and copies of any and all surveys, inspections, reports, tests or studies made by or for Buyer with respect to the Property to the extent such documents are in Buyer's possession or obtainable by Buyer. Buyer agrees that prior to the Closing, (i) Seller shall make all legally required notifications to government agencies concerning the Property, and (ii) Buyer will not disclose Hazardous Material information concerning the Property to government agencies or public officials except to the extent it is legally required to do so, or to the extent that it is reasonably necessary for Buyer to do so to conduct its investigation of the Property, or if required by judicial order or in connection with an enforceable request for information from a government agency. If Buyer, its agents, representatives or employees intend to drill boring holes, undertake any disturbance of the soil or conduct any tests which in Seller's judgment are or may be destructive, Buyer shall be permitted to do so only in accordance with a license agreement executed by and in form and substance satisfactory to Buyer and Seller.

3.4 <u>Permits and Entitlements</u>. Buyer acknowledges that it is responsible for obtaining all permits, approvals, zone clearance certificates or other authorizations or entitlements required by any federal, state or local government for Buyer's use of the Property, other than those to be obtained in connection with Seller's obligations under Section 5.1 which Seller shall be responsible to obtain.

3.5 <u>Releasees' Indemnity</u>. In reliance upon Seller's representations and warranties set forth in Section 8.2, and to the extent that Seller satisfies its obligations under Section 5.1, Buyer hereby agrees to indemnify and defend (with counsel experienced and competent in litigating issues of Hazardous Materials) Releasees, and agrees to hold Releasees, harmless from and against any and all Claims (as defined in Section 3.2 above).

ARTICLE IV
## TITLE TO PROPERTY

4.1 Title.    At the Closing, Seller shall convey to Buyer fee simple title to the Land and the Improvements, by execution and delivery of the Deed. Evidence of delivery of fee simple title shall be the issuance by Old Republic Title Insurance Company (the "Title Company") of an CLTA Owner's Policy of Title Insurance with liability in the amount of the Purchase Price (the "Title Policy"), insuring fee simple title to the Land and the Improvements in Buyer, subject only to those exceptions to title approved by Buyer pursuant to Section 6.1.(a) below. At Buyer's election, such policy may be an ALTA "Form B" policy of title insurance; provided, however, that Buyer pays all costs of such policy in excess of the cost of standard coverage.

4.2 Title to Personal Property and Contracts. At the Closing, Seller shall transfer all of its right, title and interest in and to (a) the Personal Property pursuant to the Bill of Sale and (b) the Intangible Property pursuant to the Assignment of Intangibles.

ARTICLE V
## HAZARDOUS MATERIALS REMEDIATION WORK

5.1 Feasibility Study/Remedial Action Plan. Buyer and Seller acknowledge that the Property is currently known to be contaminated with TCE/DCE/vinyl chloride and other Hazardous Materials which Seller has disclosed to Buyer in writing prior to the date hereof. Buyer agrees to acknowledge such contamination by manifesting its receipt of all reports, documents, studies, and lists of Hazardous Materials which disclose Hazardous Material detected on the Property ((by initialing or executing the same) delivered to Buyer by Seller. This Agreement is contingent upon the review and approval, not later than the Approval Date (as defined below), by a lender of Buyer's choice ("Buyer's Lender") of (i) a Feasibility Study/Remedial Action Plan or equivalent document ("FS/RAP"), as hereinafter described, approved by the State of California Regional Water Quality Control Board (the "SCRWQCB") or its Executive Officer or, (ii) in the event a FS/RAP has not been approved by the SCRWQCB or its Executive Officer, an agreement to be executed by Seller (" Interim Agreement"), wherein Seller agrees to (a) to complete a FS/RAP and submit the same to SCRWQCB, (b) to use reasonable efforts to obtain approval of a FS/RAP by the SCRWQCB or its Executive Officer, and (c) to perform the work described in the FS/RAP. When the FS/RAP is approved by the SCRWQCB or its Executive Officer, Interim Agreement shall be superseded by the FS/RAP and have no further force or effect. Seller agrees to comply with the terms of a FS/RAP. Within fifteen (15) days of the Agreement Date, Seller shall deliver to Buyer an unexecuted Interim Agreement. If Buyer fails to notify Seller of Buyer's Lender's disapproval of the Interim Agreement within fifteen (15) days after Buyer's receipt of the same ("Response Period") Buyer and Buyer's Lender shall be deemed to have approved the draft Interim Agreement. If Buyer or Buyer's Lender objects to the Interim Agreement, Buyer shall notify Seller of the specific modifications Buyer's Lender seeks to make to the same within the Response Period. Seller shall have seven (7) business days after receipt of Buyer's Lender's objections to notify Buyer that (i) Seller will incorporate the requested modifications into the Interim Agreement, (ii) Seller will incorporate some of the requested modifications or (iii) or Seller elects not to make any of the requested modifications. In the event Seller elects to incorporate all or some of the requested modifications into the Interim Agreement, Seller shall deliver a revised version of the Interim Agreement to Buyer within such seven (7) business day period. In the event the Interim Agreement is approved by the Approval Date and the FS/RAP has not been approved by the SCRWQCB or its Executive Officer at least two (2) business days prior

Page 9

to the Closing Date, then Seller and Buyer shall execute the Interim Agreement and deliver the same to Escrow Holder prior to the Closing Date.

(a) Hazardous Materials Mitigation Plans. Several methods to decontaminate the Property of Hazardous Materials are being considered by Seller. Seller shall have the absolute discretion to determine which method shall be used, and any plan shall no material change in use of the Property and no change in its existing M-2 zoning classification.

(b) One or more of the decontamination methods entail the excavation and aeration or removal of the contaminated soil. In the event a method is elected which involves excavating and aerating or removing soil, Seller will, at Seller's expense, replace and compact any soil so disturbed so as to return the disturbed area to a reasonably level and compacted to at least ninety percent (90%) of its immediately preexisting condition. Buyer acknowledges and agrees that any such disturbance of the soil is an essential part of decontaminating the Property of Hazardous Materials and delivery of the Property in such a manner shall be deemed a delivery in its "as is" condition. Notwithstanding any compaction of soil on the Property, no representation or warranty is, or shall be made, by Seller or its employees, agents, contractors or representatives as to the suitability of any compaction to support any structure or other improvement on the Property.

(c) One or more of the decontamination methods entail the destruction of Building 2 in order to decontaminate the soil under Building 2. In the event Seller determines it is necessary to demolish Building 2 to effectively decontaminate the Property, Seller shall be responsible for all costs associated with such demolition and Buyer agrees that such demolition of Building 2 is an essential part of decontaminating the Property of Hazardous Materials and delivery of the Property in such a manner shall be deemed a delivery in its "as is" condition.

(d) Whether or not a decontamination method is chosen which requires the demolition of Building 2, Seller shall have no responsibility or obligation to improve, modify or change Building 1, Building 2, Building 3 or any other Improvements.

(e) If a method for decontamination is selected by Seller and is approved by the State, which requires monitoring wells, injection wells and/or extraction wells, the Buyer shall cooperate with the State and with Seller regarding placement of said wells. Costs associated with installation and present or future operation of said wells shall be borne by Seller. Seller's responsibility for remediation of the Property, including operation and maintenance of said wells, shall cease with the State's issuance of a 'no further action' determination or approved closure of the site. Seller shall close and seal said wells according to specifications approved by the responsible regulatory agencies.

(f) If the method of decontamination selected by Seller requires ongoing activity (e.g. monitoring of wells, pumping and treatment of water, etc.) on the Property, Buyer agrees to allow such activity as an essential part of decontaminating the Property of Hazardous Materials and delivery of the Property in such a manner shall be deemed a delivery in its "as is" condition, provided that such ongoing activity shall be the sole responsibility of Seller and Seller guarantees to complete the remediation as set forth in the approved plan.

(g) Buyer acknowledges and agrees that (i) Seller may or may not be able to complete the work described in the FS/RAP prior to the Closing Date, (ii) neither the Approval Date nor the Closing Date shall be extended because of Seller's inability to complete the work described in the

Page 10

FS/RAP prior to the Closing Date, (iii) Buyer will cooperate with Seller's efforts to obtain approval of the FS/RAP and to complete the work described therein, including without limitation allowing Seller access and entry to the Property as described in Section 5.1(h), and (iv) Seller shall have the right to perform the work described in the FS/RAP or any other remediation work described herein after the Closing Date,

    (h) Seller shall have absolute and complete access and right of entry to the Property after the Closing Date for any purpose that it deems reasonably necessary to complete the work described in the FS/RAP, as well as any other remediation work, if any, of Hazardous Materials existing on the Property prior to the Closing Date for which Seller may be responsible or have liability to Buyer under this Agreement or to any third party. Such right of access and entry shall include, but shall not be limited to installation of remedial and monitoring equipment, drilling of wells, excavation, aeration, removal, replacement and/or compacting of soil, demolition of Building 2 and all other use of the Property which is reasonably necessary to remediate any Hazardous Material contamination. Buyer acknowledges and agrees that it may be precluded from using all or any portion of the Property while Seller is performing the work described in the FS/RAP, provided that Buyer shall not be precluded from using the interior of Building 1 or Building 3 and that Buyer shall having access thereto. Seller use commercially reasonable efforts to minimize interference to Buyer's use and access to Building 1 and Building 3, provided that such efforts do not materially increase the cost and expense of completing the work described in the FS/RAP. Buyer shall not use the Property in any manner which will increase the cost of completing the work described in the FS/RAP or lengthen the time it will take to complete such work.

    5.2 Insurance Policy. Buyer shall obtain a site specific pollution insurance policy (hereinafter "Insurance Policy") on or prior to the Closing if the FS/RAP has been approved by SCRWQCB or its Executive Officer, or if the FS/RAP and a contract to perform such remediation has not been approved by the Closing, within five (5) days after such approval is obtained. All premiums and costs associated with the Insurance Policy shall be paid by Buyer. The Insurance Policy shall be (i) in a form reasonably satisfactory to Buyer's Lender, (ii) issued by an insurer admitted to do business in California (iii) issued by an insurer with a policyholder rating of "A" and a financial rating of "X" in the most recent version of Best's Key Rating Guide. The Insurance Policy must contain a requirement to notify Seller in writing not less than sixty (60) days prior to any material change, reduction in coverage, cancellation or other termination thereof. Buyer agrees to maintain the Pollution Liability Policy for not less than five (5) years after the Closing Date. Buyer agrees to deliver to Seller certified copies of the Insurance Policy evidencing the existence of such insurance and Buyer's compliance with the provisions of this Section . Buyer agrees to cause a replacement policy or certificates to be delivered to Seller not less than thirty (30) days prior to the expiration of any such policy. If any such initial or replacement policies or certificates are not furnished within the time(s) specified herein, Buyer will be deemed to be in material default under this Agreement, and Seller will have the right, but not the obligation, to procure such insurance as Seller deems necessary to protect Seller's interests at Buyer's expense. If Seller obtains any insurance that is the responsibility of Buyer under this Section, Seller agrees to deliver to Buyer a written statement setting forth the cost of any such insurance and showing in reasonable detail the manner in which it has been computed and Buyer agrees to promptly reimburse Seller for such costs. The Insurance Policy shall cover at least the following five (5) areas of coverage:

    (a) Any and all costs of Hazardous Materials remediation exceeding 120% of contracted remediation costs at the time the policy is issued.

(b) Any and all costs of cleanup associated with unknown Hazardous Material contaminants discovered during the remediation process.

(c) Any and all costs associated with remediation of Hazardous Materials which occurs after the original FS/RAP has been executed and a "no further action" or "approved closure status" report has been issued by SCRWQCB.

(d) Any and all costs and expenses associated with any future diminution of land value incurred by adjacent or downstream property owners as a result of insured contaminants migrating from this Property, which occurs after the original FS/RAP has been executed and a "no further action" or "approved closure status" report has been issued by SCRWQCB.

(a) Any and all costs and expenses associated with bodily injury to third parties as a result of insured contaminants on, or migrating from, the Property, which occurs after the original FS/RAP has been executed and a "no further action" or "approved closure status" report has been issued by SCRWQCB.

## ARTICLE VI
### BUYER'S AND SELLER'S CONDITIONS TO CLOSING

6.2 Buyer's Conditions To Closing    The following conditions are conditions precedent to Buyer's obligation to purchase the Property, each of which may be waived by Buyer in its sole discretion:

(a) Approval of Title.  Buyer shall have until the forty-fifth (45th) day after the Agreement Date (the "Approval Date") to review and approve the following:

(i) a current preliminary report on the Real Property, accompanied by copies of all documents referred to in the report other than encumbrances to be discharged by Seller on or before the Closing;

(ii) copies of the most recent property tax bills for the Property; and

(iii) a survey of the Real Property by a licensed surveyor or engineer hired by Buyer.

Seller will cause to be delivered to Buyer a CLTA preliminary report, together with copies of title exceptions shown in Schedule B thereto, within fifteen (15) days of the Agreement Date. Buyer shall notify Seller on or before the Approval Date what exceptions to title, if any, will not be accepted by Buyer. Buyer will not unreasonably withhold its approval of title. Without limiting the foregoing, Buyer shall take title to the Property subject to any and all non-delinquent taxes and any matters which do not materially adversely interfere with the use of the Property. If Buyer fails to notify Seller of its disapproval of any of the aforesaid items by the Approval Date, Buyer shall be deemed to have approved the condition of title to the Real Property. If Buyer objects to any exceptions to title, Seller shall have five (5) business days after receipt of Buyer's objections to notify Buyer: (i) that Seller will remove any objectionable exceptions from title and provide Buyer with evidence reasonably satisfactory to Buyer of such removal, or provide Buyer with evidence reasonably satisfactory to

Buyer that said exceptions will be removed on or before the Closing (in either of which event, Seller may extend the Closing Date for such period as shall be required to effect such cure, but not beyond thirty (30) days); or (ii) that Seller elects not to cause such exceptions to be removed. The procurement by Seller of a commitment for the issuance of the Title Policy or an endorsement thereto insuring Buyer against any title exception which was disapproved pursuant to this Section 6.1.(a) shall be deemed a cure by Seller of such disapproval. If Seller gives Buyer notice under clause (ii), Buyer shall have three (3) days in which to notify Seller that Buyer will nevertheless proceed with the purchase and take title to the Property subject to such exceptions, or that Buyer will terminate this Agreement. If this Agreement is terminated pursuant to the foregoing provisions of this section, then neither party shall have any further rights or obligations hereunder (except for any indemnity obligations of either party pursuant to the other provisions of this Agreement), the Deposit shall be returned to Buyer and each party shall bear its own costs incurred hereunder. If Buyer shall fail to notify Seller of its election within said three (3) day period, Buyer shall be deemed to have not elected to proceed with the purchase and take title to the Property subject to such exceptions.

(b) Review of Other Matters. Buyer shall have until the Approval Date to review and approve the physical condition of the Property, including, without limitation, the environmental condition of the Property, as determined by inspections and tests performed by Buyer and its consultants in accordance with Section 3.3 herein, to review and approve Seller's Documents, to review and approve any and all other aspects of the Property, its ownership, use and operation. Buyer acknowledges that it has received from Seller or Seller's representatives, agents or consultants, and has been given the opportunity to review, the documents described in **Exhibit D** attached hereto and made a part hereof which relate to Seller's ownership, operation and management of the Property. In the event Seller discovers other material documents in its files which related to its ownership, operation or management of the Property, Seller shall promptly make such documents available for Buyer's review, however, the discovery of such documents shall not extend the Approval Date, Closing or the Closing Date (as defined below). After Buyer's initial review of the foregoing documents, Buyer may elect to review additional documents generated by Seller's consultants which may provide additional information concerning the Property not contained in Seller's files. Seller shall exercise all reasonable efforts to make such additional documents available to Buyer in a timely manner. Buyer shall have the right upon reasonable notice to Seller and at Buyer's cost, to audit Seller's records of income and expenses for the Property for the period of Seller's ownership of the same. All documents and information reviewed or obtained by Buyer from Seller or any of its affiliates and subsidiaries and any of their respective officers, directors, participants, employees, contractors, consultants, representatives, property management companies and agents (the "**Seller's Representatives**") relating to the Property are hereinafter collectively referred to as the "**Seller's Documents**". Subject to the provisions of Sections 8.2(d) and (e), Buyer acknowledges that the Seller's Documents may not constitute all documents in the actual or constructive possession of Seller, though Seller shall make a diligent search for its files that relate to the ownership, operation and management of the Property. Buyer shall confirm its receipt of copies of Seller's Documents by executing and delivering to Seller a written receipt therefor. Buyer's execution of this Agreement, however, shall constitute its confirmation of receipt of the documents described in Exhibit D. Subject to the provisions of Sections 8.2(d) and (e), providing Buyer with access to Seller's Documents is solely an accommodation to Buyer and shall not create or give rise to any liability of, or against, Seller and/or any of Seller's Representatives, except as expressly set forth herein. Other than as set forth in Sections 8.2(d) and (e), Buyer acknowledges and agrees that Seller's Documents are provided without any representation or warranty of Seller or any of Seller's Representatives, of any kind, either express or implied. Without limiting the foregoing, (a) neither Seller nor any of Seller's Representatives have reviewed Seller's Documents for completeness or accuracy, (b) Buyer

Page 13

acknowledges that Seller's Documents may be incomplete or inaccurate, and (c) neither Seller nor any of Seller's Representatives represents or warrants the accuracy or completeness of Seller's Documents or any matter contained therein. Buyer shall be responsible for the cost and expense of any and all inspections, reviews, studies and/or reports performed or commissioned by or on behalf of Buyer.

If Buyer fails to notify Seller as of Approval Date that Buyer disapproves of a matter that concerns the Property, Buyer shall be deemed to have approved all matters concerning the Property. If Buyer disapproves any item, which Buyer may do in its sole and absolute discretion, then this Agreement shall be terminated and neither party shall have any further rights or obligations hereunder (except for any indemnity obligations of either party pursuant to the other provisions of this Agreement), the Deposit shall be returned to Buyer and each party shall bear its own costs incurred hereunder.

(c) The Obtainment of Financing. Buyer shall have until the Approval Date to notify Seller in writing that it has obtained financing for the acquisition of the Property as set forth herein, and the construction of the Interior Improvements. If Buyer fails to notify Seller in writing on or before the Approval Date that Buyer has obtained such financing or has waived this contingency, Buyer shall be deemed not to have obtained such financing and this contingency shall be deemed not to be satisfied and this Agreement shall automatically terminate. If Buyer informs Seller in writing that such financing has not been obtained, then this Agreement shall terminate. Upon termination hereof, neither party shall have any further rights or obligations hereunder (except for any indemnity obligations of either party pursuant to the other provisions of this Agreement), the Deposit shall be returned to Buyer and each party shall bear its own costs incurred hereunder.

(d) Compliance by Seller. Seller shall have complied with each and every condition of this Agreement to be kept or complied with by Seller in a manner that is sufficiently timely so that Buyer does not suffer any material prejudice or damage.

(e) No Material Change in the Physical Condition. The physical condition of the Property shall be substantially the same on the Closing Date as on the date of Buyer's execution of this Agreement, the demolition of Building 2, changes and alterations (temporary or permanent in connection with the completion of the FS/RAP, reasonable wear and tear and loss by casualty (subject to the provisions of Article XI below) excepted.

(f) No Litigation. As of the Closing Date, there shall be no litigation or administrative agency or other governmental proceeding, pending or threatened, which after Closing would materially adversely affect the Property or the ownership, use or operation thereof.

(g) Title Policy. The issuance of the Title Policy as set forth in Section 4.1.

(h) Seller's Representations and Warranties. All of Seller's representations and warranties contained in or made pursuant to this Agreement shall have been true and correct when made and shall be true and correct as of the Closing Date.

(i) Seller's Article V Obligations. Seller's obligations set forth in Article V have been satisfied to the extent such obligations are required to be satisfied as of the Closing Date.

(j) The vacation of the Property by any tenant thereof, as set forth in Article IX.

(k) <u>Satisfaction or Waiver of Condition</u>. In the event that this Agreement is not terminated pursuant to the terms of this Article VI, except in the event of a default hereunder by Seller, the Deposit shall be non-refundable to Buyer and shall belong to Seller as liquidated damages pursuant to Section 2.4.

6.2 <u>Seller's Conditions To Closing</u>. The following conditions are conditions precedent to Seller's obligation to sell the Property:

(a) <u>Compliance by Buyer</u>. Buyer shall have complied with each and every condition of this Agreement to be kept or complied with by Buyer.

6.3 <u>Buyer's Right to Extend the Approval Date</u>. Buyer shall have the right to extend the Approval Date for two successive thirty (30) day periods (the "Extension Option") provided that:

(a) On or before the Approval Date, Buyer shall deliver to (i) Seller (x) a notice exercising the Extension Option to extend the Approval Date thirty (30) days **(the "First Extension Notice")** and (y) Twenty-five Thousand Dollars ($25,000) (**"Extension Payment No. 1"**), and (ii) an instruction to Escrow Holder (with a copy delivered to Seller together with the First Extension Notice) to immediately disburse to Seller the Deposit (**"Deposit Disbursement Authorization"**). Upon Seller's timely receipt of the First Extension Notice, Extension Payment No. 1 and Deposit Disbursement Authorization, the Approval Date shall be deemed extended thirty (30) days to a date which is seventy-five (75) days from the Agreement Date.

(b) On or before the Approval Date as extended in accordance with the provisions of Section 6.3(a), Buyer shall deliver to Seller (i) a notice exercising the Extension Option to extend the Approval Date another thirty (30) days (the "Second Extension Notice") and (ii) Twenty-five Thousand Dollars ($25,000) (**"Extension Payment No. 2"**). Upon Seller's timely receipt of the Second Extension Notice and Extension Payment No. 2 the Approval Date shall be deemed extended thirty (30) days to a date which is one hundred five (105) days from the Agreement Date.

(c) Extension Payment No. 1 and Extension Payment No. 2 shall be nonrefundable. Notwithstanding any provision in this Agreement to the contrary, upon Buyer's satisfaction of the conditions set forth in Section 6.3(a) the Deposit shall be nonrefundable and interest shall no longer accrue on the Deposit once it is received by Seller. Extension Payment No. 1, Extension Payment No. 2 and the Deposit shall be applied to the Purchase Price of the Property if Buyer does not terminate this Agreement and purchases the Property.

ARTICLE VII
<u>CLOSING</u>

7.1 <u>Deposit with Escrow Holder</u>. This instrument shall serve as the instructions to Escrow Holder with respect to the Deposit. Seller and Buyer agree (i) to cause the Escrow Holder to comply with the terms of this Agreement with respect to the Deposit, and (ii) to execute such additional and supplementary escrow instructions as may be reasonably appropriate to enable the Escrow Holder to comply with the terms of this Agreement.

7.2 <u>Closing.</u> The closing hereunder (the "Closing") shall take place, and delivery of all items to be made at the Closing under the terms of this Agreement, shall be made at the offices of the Title Company. The execution and exchange of documents shall take place at the Closing which shall be on or before the date which is the earlier of (i) the thirtieth (30th) day following the Approval Date, (ii) the day that is ten (10) days after delivery of written notice from Buyer to Seller of Buyer's election to close escrow, but in no event earlier than December 10, 1998, subject to the recording of documents and disbursement of funds on the following business day (the "Closing Date"). All documents shall be deemed delivered on the date the Deed is recorded. The Closing may occur on such earlier date as Buyer and Seller may agree but such dates may not be extended without the written approval of both Seller and Buyer, except as otherwise expressly provided herein.

7.3 Delivery by Seller.  At the Closing, Seller shall deliver the following to Escrow Holder:

(a) The Deed, duly executed and acknowledged by Seller, in recordable form, and ready for recordation on the Closing Date;

(b) Four (4) counterparts of the Bill of Sale, duly executed by Seller;

(c) Four (4) counterparts of the Assignment of Intangibles, duly executed by Seller,

(d) An affidavit executed by Seller which satisfies the requirements of Section 1445 of the United States Internal Revenue Code of 1986, as amended, and a California FTB Form 590 executed by Seller (the "Transferor Certificates"); and

(e) Any other documents or instruments called for hereunder which have not previously been delivered.

Notwithstanding anything to the contrary elsewhere in this Agreement Buyer, in its sole discretion, may waive Seller's obligation to deliver at the Closing any of the items described above in this Section 7.3, but such waiver shall only be effective if it is in writing, executed by Buyer, and delivered to Seller at or prior to the Closing.

7.4 <u>Delivery by Buyer.</u> Prior to the Closing Date, Buyer shall deliver to Escrow Holder the Purchase Price, as adjusted pursuant to Sections 7.7, 7.8, 7.9 and 7.10 to close escrow. Prior to the Closing Date, Buyer shall further deposit with Escrow Holder the following:

(a) Four (4) counterparts of the Bill of Sale, duly executed by Buyer;

(b) Four (4) counterparts of the Assignment of Intangibles duly executed by Buyer;

(c) Such resolutions, authorizations, bylaws or other corporate documents or agreements relating to Buyer as Seller shall reasonably require in connection with this transaction; and

(d) Any other documents or instruments called for hereunder which have not been previously delivered.

Notwithstanding anything to the contrary elsewhere in this Agreement, Seller, in its sole discretion, may waive Buyer's obligation to deliver at the Closing any of the items described above in

**7.2** <u>Closing.</u>  The closing hereunder (the "Closing") shall take place, and delivery of all items to be made at the Closing under the terms of this Agreement, shall be made at the offices of the Title Company.  The execution and exchange of documents shall take place at the Closing which shall be on or before the date which is the earlier of (i) the thirtieth (30th) day following the Approval Date, (ii) the day that is ten (10) days after delivery of written notice from Buyer to Seller of Buyer's election to close escrow, but in no event earlier than December 10, 1998, subject to the recording of documents and disbursement of funds on the following business day (the "Closing Date").  All documents shall be deemed delivered on the date the Deed is recorded.  The Closing may occur on such earlier date as Buyer and Seller may agree but such dates may not be extended without the written approval of both Seller and Buyer, except as otherwise expressly provided herein.

**7.3** Delivery by Seller.   At the Closing, Seller shall deliver the following to Escrow Holder:

(a) The Deed, duly executed and acknowledged by Seller, in recordable form, and ready for recordation on the Closing Date;

(b) Four (4) counterparts of the Bill of Sale, duly executed by Seller;

(c) Four (4) counterparts of the Assignment of Intangibles, duly executed by Seller.

(d) An affidavit executed by Seller which satisfies the requirements of Section 1445 of the United States Internal Revenue Code of 1986, as amended, and a California FTB Form 590 executed by Seller (the "Transferor Certificates"); and

(e) Any other documents or instruments called for hereunder which have not previously been delivered.

Notwithstanding anything to the contrary elsewhere in this Agreement Buyer, in its sole discretion, may waive Seller's obligation to deliver at the Closing any of the items described above in this Section 7.3, but such waiver shall only be effective if it is in writing, executed by Buyer, and delivered to Seller at or prior to the Closing.

**7.4** <u>Delivery by Buyer.</u>  Prior to the Closing Date, Buyer shall deliver to Escrow Holder the Purchase Price, as adjusted pursuant to Sections 7.7, 7.8, 7.9 and 7.10 to close escrow.  Prior to the Closing Date, Buyer shall further deposit with Escrow Holder the following:

(a) Four (4) counterparts of the Bill of Sale, duly executed by Buyer;

(b) Four (4) counterparts of the Assignment of Intangibles duly executed by Buyer;

(c) Such resolutions, authorizations, bylaws or other corporate documents or agreements relating to Buyer as Seller shall reasonably require in connection with this transaction; and

(d) Any other documents or instruments called for hereunder which have not been previously delivered.

Notwithstanding anything to the contrary elsewhere in this Agreement, Seller, in its sole discretion, may waive Buyer's obligation to deliver at the Closing any of the items described above in

this Section 7.3, but such waiver shall only be effective if it is in writing, executed by Seller, and delivered to Buyer at or prior to the Closing.

7.5 Other Instruments.  Seller and Buyer shall each deposit such other instruments as are reasonably required by Escrow Holder or otherwise required to close the escrow and consummate the purchase of the Property in accordance with the terms hereof.

7.6 Close of Escrow.  Provided that Buyer and Seller deliver to Escrow Holder the documents and funds described in Sections 7.3, 7.4 and 7.5 hereof, and further provided that the Title Company has issued or is unconditionally and irrevocably committed to issue to Buyer the Title Policy, the parties shall instruct Escrow Holder at 8:00 a.m. on the Closing Date to:

(a) Deliver the Purchase Price (adjusted by prorations and costs of escrow as set forth herein) to Seller by wire transfer to the bank account or accounts to be designated by Seller, and advise Seller by telephone of the Federal Reserve System wire transfer number or numbers;

(b) Record the Deed with the San Mateo County Recorder; and

(c) Assemble and deliver two (2) fully executed counterparts of the Bill of Sale, the Assignment of Leases and the Assignment of Intangibles to both Buyer and Seller.

7.7 Prorations and Apportionments.

(a) All revenues and all expenses of the Property shall be prorated and apportioned as of 12:01 a.m. on the day of the Closing, so that Seller bears all expenses with respect to the Property and shall have the benefit of all income with respect to the Property through and including the period preceding the Closing.  Any revenue or expense amount which cannot be ascertained with certainty as of Closing shall be prorated on the basis of the parties' reasonable estimates of such amount, and shall be the subject of a final proration sixty (60) days after Closing or as soon thereafter as the precise amounts can be ascertained.  A statement setting forth such agreed prorations shall be delivered to Escrow Holder.  Escrow Holder shall not be required to calculate any prorations.

(b) Expenses to be prorated shall include taxes (including personal property taxes on Personal Property), water rates and sewer rents, if any, gas, electricity and other utility charges, any unfixed meter charges (apportioned on the basis of the last meter reading), license and permit fees and other expenses customarily prorated.

(c) Escrow Holder shall exercise all reasonable efforts to deliver to both Seller and Buyer no later than 3 days prior to the scheduled Closing Date, an estimated closing or settlement statement.

7.8 Payment of Adjustments to Proration.  Either party owing the other party a sum of money based on adjustments made to prorations after the Closing Date shall promptly pay that sum to the other party, together with interest thereon at the rate of eighteen percent (18%) per annum (but in no event greater than the maximum rate then permitted by law to be contracted for by the parties) from the date of demand therefor to the date of payment, if payment is not made within ten (10) days after delivery of a statement therefor.

**7.9** <u>Costs and Expenses</u>. Seller shall pay one half of the Escrow Holder's fee, the premium for the Title Policy (to the extent it does not exceed the cost of a CLTA policy) and any documentary transfer taxes. Buyer shall pay for all of its own costs of surveying and inspecting the Property, fees and costs related to any financing obtained by Buyer in connection with the purchase, the cost of any transfer taxes (other than documentary transfer taxes) applicable to the sale of the Property, one half of the Escrow Holder's fee, and the premium for the Title Policy (to the extent it exceeds the cost of a CLTA policy) and the cost of all endorsements to the Title Policy. Except as set forth in Section 2.4 herein, Buyer and Seller shall share equally all recording and filing charges and all other costs and charges of the escrow for the sale; provided, however that Buyer and Seller shall each pay their own legal (including attorneys' fees and costs) and accounting fees.

**7.10** <u>Insurance; Utilities</u>. Buyer acknowledges that Seller will cause its policies of casualty and liability insurance to be terminated as of the Closing Date, and Buyer shall be responsible for obtaining its own insurance as of the Closing Date and thereafter. Any deposits for utilities made by Seller shall be refunded to Seller and Buyer shall arrange for any required replacements thereof.

ARTICLE VIII
<u>REPRESENTATIONS, WARRANTIES AND COVENANTS</u>

**8.1** <u>Buyer's Representations</u>. Buyer represents and warrants to Seller as follows:

(a) Buyer is a California limited liability company in good standing in California.

(b) This Agreement (i) is duly authorized, executed and delivered by Buyer; and (ii) constitutes a legal, valid and binding obligation of Buyer and is enforceable against Buyer in accordance with its terms (except as the enforcement of this Agreement may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and similar laws affecting creditors' rights generally and by equitable principles of general application). Neither the execution or delivery of this Agreement nor performance of Buyer's obligations under this Agreement violates, or will violate, any contract or agreement to which Buyer is a party or by which Buyer is otherwise bound.

(c) The documents executed by Buyer that are to be delivered to Seller at the Closing will be (i) duly authorized, executed and delivered by Buyer; and (ii) legal, valid and binding obligations of Buyer and enforceable against Buyer in accordance with their terms (except as such enforcement may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and similar laws affecting creditors' rights generally and by equitable principles of general application).

(d) There are no actions, suits, claims or other proceedings pending or, to Buyer's knowledge, contemplated or threatened against Buyer (or any basis for any claim) that could affect Buyer's ability to perform its obligations when and as required under the terms of this Agreement.

(e) No representation or warranty made by Buyer in this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the representation not misleading in light of the circumstances in which it is made.

**8.2** <u>Seller's Representations</u>. Seller represents and warrants to Buyer as follows:

(a) Seller is a California corporation duly organized and validly existing, is in good standing and has the authority to own and convey the Property;

Page 18

(b) Subject to Section 6.1, this Agreement and all documents executed by Seller which are to be delivered to Buyer at the Closing are or at the time of Closing will be duly authorized, executed, and delivered by Seller, are or at the time of Closing will be legal, valid, and binding obligations of Seller, and do not and at the time of Closing will not violate any provisions of any agreement or judicial order to which Seller is a party or to which Seller or the Property is subject;

(c) Neither Seller's execution and delivery of this Agreement nor Seller's performance of all obligations hereunder require the consent or approval of any person other than Seller. Such execution, delivery and performance will not result in a breach of or constitute a default under any indenture, loan or credit agreement, deed of trust, mortgage or other agreement;

(d) Seller has made good faith efforts to locate Seller's Documents, and has made all of Seller's Documents available to Buyer for Buyer's inspection and copying as set forth in Section 6.1.(b); and

(e) To Seller's knowledge, Seller has not failed to disclose to Buyer any material defect in the physical condition of the Property, or in the title to the Property, of which Seller is aware, and which is not otherwise known to Buyer or could be known to Buyer through the inspections, investigations and reviews permitted in this Agreement if undertaken in a manner which is normal and customary for persons who are experienced in the acquisition of real property similar to the Property. Seller's knowledge, and Seller's awareness, as used in this sub-section (e), shall mean the current actual knowledge of Mike Gotterba, Dan Prideaux and Murray McCreary_, individuals, employees of Mitsubishi Silicon America, the recent manager of the Property, and are given in their capacity as employees of Mitsubishi Silicon America, and not in their individual capacities. Seller represents that Dan Prideaux, Mike Gotterba and Murray McCreary are the employees of the current property manager who are most familiar with the Property.

## 8.3   Limitation on Liability

(a) Buyer acknowledges and agrees that if it discovers or has discovered through its investigation and due diligence any information relating to the Property which is not consistent with the representations and warranties made by Seller under this Article VIII, then Buyer shall immediately disclose such information to Seller in writing. Buyer shall not be entitled to rely on any representations or warranties which are inconsistent with such information.

(b) If Buyer closes the purchase of the Property in accordance with this Agreement, Buyer shall be deemed to have waived any rights or claims as against Seller for any reason related to the Property or Buyer's purchase thereof except for the representations and warranties contained in Section 8.2 and Seller's obligations under Section 5.1. Buyer further waives any rights or claims arising out of any inaccuracy in the representations and warranties contained in this Article VIII and in any closing documents as to which Buyer has not given written notification to Seller of an asserted breach within one hundred and eighty (180) days after the Closing, which notification must describe with specificity the nature of the asserted breach and the amount of the claim. Seller shall have no liability to Buyer for any breach of such representations and warranties except to the extent of the amount that the aggregate amount of all claims under this Agreement exceeds Twenty Thousand Dollars ($20,000), and in no event shall Seller's liability hereunder or in connection with the purchase and sale contemplated hereby exceed One Million Dollars ($1,000,000). Buyer agrees to first seek reimbursement pursuant to any insurance policies (to the extent they provide coverage therefor), prior

to seeking recovery from Seller. Seller shall not be liable hereunder if Buyer's claim is satisfied pursuant to any insurance policy or from any tenant or tenants pursuant to operating expense pass-through clauses in any Leases or otherwise.

(c) Limited Liability. Buyer, on behalf of itself and its directors, officers and representatives hereby agrees that in no event or circumstance shall Seller, any of its directors, officers, representatives or employees, any partners of Seller, or any representatives, employees or partners of the partners of Seller, have any personal liability under this Agreement, or to any of Buyer's creditors, or to any other party in connection with the Property.

## ARTICLE IX
## POSSESSION

Possession of the Property shall be delivered to Buyer on the Closing Date. Seller represents that as of the Closing Date, the term of all leases of the Land or space in the Improvements, if any, shall expire or be terminated.

## ARTICLE X
## OPERATION OF THE PROPERTY

Seller shall not, after the Agreement Date and prior to the Closing Date or any earlier termination of this Agreement, enter into any lease or amendment of lease pertaining to the Property without in each case obtaining Buyer's prior written consent thereto, which consent Buyer shall not unreasonably withhold or delay and which shall be deemed given unless denied in writing within five (5) business days after request therefor. Between Seller's execution of this Agreement and the Closing, Seller shall maintain the Property in the manner which it has been maintained prior to the Agreement Date.

## ARTICLE XI
## LOSS BY FIRE OR OTHER CASUALTY; CONDEMNATION

11.1 Damage or Destruction.

(a) In the event that the Improvements are damaged or destroyed by fire or other casualty prior to the Closing Date and such damage or destruction is estimated to cost $250,000 or less in the aggregate to repair or replace (as verified by an architect or contractor reasonably selected by Seller) but excluding any damage or destruction to Building 2, then the Closing Date shall occur as scheduled without any reduction in the Purchase Price notwithstanding such damage or destruction, and all proceeds of insurance payable to Seller by reason of such damage or destruction shall be paid or assigned to Buyer, it being agreed that in such event Seller shall have no obligation to repair or restore the Property.

(b) Seller hereby informs Buyer that it has not obtained (and does not anticipate obtaining) any insurance on the Improvements (including without limitation Building 1 and Building 3) covering any fire or other casualty to the same. In the event that any of the Improvements (other than Building 2) are damaged or destroyed by fire or other casualty prior to the Closing Date, and such damage or destruction is estimated to cost more than $250,000 in the aggregate to repair or replace (as verified by an architect or contractor reasonably selected by Seller), then Buyer shall have the option to terminate this Agreement by written notice to the other within five (5) days after the

Page 20

occurrence of the damage or destruction. In the event of such termination, then neither Buyer nor Seller shall thereafter have any obligations or liabilities hereunder, and the Deposit shall be returned to Buyer. In the event that Buyer does not terminate this Agreement in accordance with this Section 11.1(b), the Closing Date shall occur as scheduled without any reduction in the Purchase Price notwithstanding such damage or destruction, and all proceeds of insurance payable to Seller by reason of such damage or destruction, if any, shall be paid or assigned to Buyer, it being agreed that in such event Seller shall have no obligation to repair or restore the Property, or to obtain any insurance for fire or other casualty.

　11.2 <u>Condemnation.</u>　In the event that prior to the Closing Date, a governmental entity shall commence any eminent domain proceeding to take any material portion of the Property, then Buyer shall have the option to elect either of the following:

　　(a) Terminate this Agreement by written notice to Seller within five (5) days after its receiving notice of such action of condemnation, in which event, neither Buyer nor Seller shall thereafter have any obligations or liabilities hereunder, and the Deposit (and Extension Payment No. 1 and Extension Payment No. 2) shall be returned to Buyer. All escrow cancellation charges shall be paid by Buyer and Seller equally; or

　　(b) Elect to proceed with the transaction, in which case the Purchase Price shall not be reduced and Buyer shall be entitled to the net award paid to Seller for such taking, if any, and Seller shall assign and transfer to Buyer all right, title and interest in and to any awards, it being expressly agreed that in such event Seller shall have no obligation to repair or restore the Property or any portion thereof.

ARTICLE XII
<u>MISCELLANEOUS</u>

　12.1 <u>Notices.</u>　Any notice under this Agreement must be in writing and be personally delivered, delivered by recognized overnight courier service or given by mail or via facsimile. Any notice given by mail must be sent, postage prepaid, by certified or registered mail, return receipt requested. All notices must be addressed to the parties at the following addresses or at such other addresses as the parties may from time to time direct in writing:

Buyer:　　　　____Integris/Millennium Joint Venture LLC__
　　　　　　　____120 Independence Dr._____
　　　　　　　____Menlo Park, CA 95025_____

Seller:　　　　____Mitsubishi Silicon America_____
　　　　　　　____1351 Tandem Avenue N.E._____
　　　　　　　____Salem, Oregon  97303_____

　　　　　　With a Copy to

　　　　Washburn, Briscoe & McCarthy
　　　　　　55 Francisco St. Suite 600
　　　　　　San Francisco, CA  94133
　　　　　　(415) 421-3200

Page 21

(415) 421-5044 (fax)
Attn: Richard H. Rosenthal Esq.

Any notice will be deemed to have been given, if personally delivered, when delivered, and if delivered by courier service, one (1) Business Day after deposit with the courier service, and if mailed, five (5) Business Days after deposit at any post office in the United States of America, and if delivered via facsimile, the same day as verified; provided that any verification that occurs after 5 p.m. on a Business Day, or at any time on a Saturday, Sunday or holiday, will be deemed to have occurred as of 9 a.m. on the following Business Day.

12.2 <u>Brokers and Finders</u>. In connection with the transaction contemplated by this Agreement, Buyer has agreed to pay a brokerage commission equal to $180,000 to Loren Baxter, a principal of Buyer (collectively, the "Broker") pursuant to a separate agreement between Buyer and Broker. In the event of a claim for broker's fee, finder's fee, commission or other similar compensation in connection herewith other than as set forth above, Buyer, if such claim is based upon any agreement alleged to have been made by Buyer, hereby agrees to protect and indemnify Seller against and hold Seller harmless from any and all damages, liabilities, costs, expenses and losses (including, without limitation, reasonable attorneys' fees and costs) which Seller may sustain or incur by reason of such claim, and Seller, if such claim is based upon any agreement alleged to have been made by Seller, hereby agrees to protect and indemnify Buyer against and hold Buyer harmless from any and all damages, liabilities, costs, expenses and losses (including, without limitation, reasonable attorneys' fees and costs) which Buyer may sustain or incur by reason of such claim; provided, in either case, that there was a reasonable basis for such claim. In the event that it is determined by a finder of fact that no reasonable basis for such claim existed, the indemnitee shall reimburse the indemnitor for defense costs so incurred. The Broker represents Buyer only.

12.3 <u>Successors and Assigns</u>. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors, heirs, administrators and assigns, except that Buyer's interest under this Agreement may not be assigned, encumbered or otherwise transferred, whether voluntarily, involuntarily, by operation of law or otherwise, without the prior written consent of Seller, which Seller may give or deny in its sole discretion.

12.4 <u>Amendments</u>. This Agreement may be amended or modified only by a written instrument executed by the party asserted to be bound thereby.

12.5 <u>Interpretation</u>. Words used in the singular number shall include the plural, and vice-versa, and any gender shall be deemed to include each other gender. The captions and headings of the Articles and Sections of this Agreement are for convenience of reference only, and shall not be deemed to define or limit the provisions hereof.

12.6 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

12.7 <u>Merger of Prior Agreements</u>. This Agreement and the exhibits hereto constitute the entire agreement between the parties with respect to the purchase and sale of the Property and supersedes all prior and contemporaneous agreements and understandings between the parties hereto relating to the subject matter hereof, including without limitation the letter dated June, 20, 1996, from Seller to Buyer with respect to the Property.

**12.8 Disputes.**

(a) Dispute Resolution. It is acknowledged by the Parties that a quick and efficient resolution of all claims, disputes and other matters in question under this Agreement ("Disputes") is critical to the implementation of the terms of this Agreement. In order to effectuate such intent, the parties hereby establish this Dispute procedure for use during the term of this Agreement. The dispute resolution procedures set forth in this Section 12.8 shall govern the resolution of any Dispute unless otherwise provided in this Agreement or mutually agreed to by the Parties (for the purposes of this Section 12.8, all parties that participate in such dispute resolution mechanism, e.g., Buyer and Seller, are collectively referred to as the "Parties" and individually referred to as a "Party"). The Parties agree to first negotiate in good faith to attempt to resolve any differences that arise under this Agreement. In the event that the Parties are unsuccessful in resolving a Dispute through such negotiations, the controversy shall be submitted next to mediation and if mediation is unsuccessful, then to arbitration or to court, all as provided below.

(b) Good-Faith Negotiations The process of "good-faith negotiations" requires that each Party set out in writing to the other its reason(s) for adopting a specific conclusion or for selecting a particular course of action, together with the sequence of subordinate facts leading to the selecting conclusion or course of action. Such Parties shall attempt to agree on a mutually agreeable resolution of the Dispute. Upon request, each Party shall promptly make available to the other such information, including existing studies and raw data, to the extent related to the Dispute. The related information to be made available must include both studies and raw data that support the position advocated and existing studies and raw data that are related to, but do not support, the position advocated. A Party shall not be required as part of these negotiations to provide any information which is confidential or proprietary in nature unless it is satisfied in its discretion that the other Party will maintain the confidentiality of and will not misuse such information or any information subject to attorney-client or other privilege under applicable law regarding discovery and production of documents.

Additionally, where one Party possesses the exclusive capability of collecting additional raw data or making additional studies related to the Dispute, it shall accommodate reasonable requests from the other Party requesting such data or studies, subject to limitations on disclosure of confidential, proprietary, or privileged information. The Party requesting such data shall reimburse the other Party for the cost incurred to provide the data. The negotiation process shall include at least two meetings to discuss any Dispute prior to invoking mediation rights. Unless otherwise mutually agreed, the first meeting shall take place within ten (10) days after either Party has received notice from the other of the desire to commence formal negotiations concerning the Dispute. Unless otherwise mutually agreed, the second meeting shall take place no more than ten (10) days later. In the event a Party refuses to attend a negotiation meeting, the Dispute shall proceed immediately to arbitration or litigation.

(c) Mediation. Mediation shall be initiated at any time by mutual agreement or by written notice from one Party to the other at any time after the second negotiation meeting referred to in Section 12.8(b) above (the "Mediation Notice"). The Mediation Notice shall specify the issue(s) to be submitted to mediation, including a summary of the complaining Party's position with respect thereto and a proposed resolution. The Party(s) receiving Mediation Notice shall have the right to rebut the issue(s) set forth in the Mediation Notice. The Parties shall appoint a mediator within ten (10) days after receipt of the Mediation Notice. In the event the Parties are unable to agree upon a mediator within such time frame, the American Arbitration Association will be requested to designate

three potential mediators, each of whom (1) shall have agreed to mediate the Dispute, (2) shall be unaffiliated with Buyer and Seller, or any of their affiliates, (3) shall be qualified by training or experience to address the issue in controversy, and (4) shall be available to fulfill the responsibilities of mediation in a timely manner. Each Party shall be provided relevant information related to each potential mediator, including applicable fees; and each shall designate its first, second, and third choices among the potential mediators, with the designated choice receiving four, three, and one point(s), respectively. In the event a Party fails to designate an order of choice, each potential mediator shall receive one point. The potential mediator receiving the most points shall be the mediator. Unless otherwise mutually agreed, mediation shall commence two weeks after the selection of the mediator. The mediation shall proceed in accordance with the rules for commercial mediation established by the American Arbitration Association absent the contrary agreement of the Parties. Mediation shall continue until the Parties mutually agree to terminate the process, the mediator determines that the process is not working, or ten (10) Business Days have elapsed since the commencement of mediation and the Parties do not by mutual agreement extend the process. The fees and expenses of the mediator shall be shared equally by the Parties, and each Party shall bear its own costs. Notwithstanding the foregoing, the mediator shall have the power to order a Party to pay up to one hundred percent (100%) of the cost of the mediation, including the another Party's costs, if the mediator finds that such Party unreasonably or in bad faith demanded or caused such mediation. This Agreement and the rights and obligations of the Parties shall remain in full force and effect pending the award in any mediation proceeding hereunder. This agreement to mediate shall be binding upon the successors and assigns of each Party. Either Party may, without inconsistency with this Agreement, seek from any court of competent jurisdiction any interim or provisional relief that may be necessary to protect the rights or property of that Party, pending the result of the mediation.

(d) Arbitration. Once the mediation process has terminated without a resolution of the Dispute, or earlier if the Parties that are involved in the Dispute agree, the Dispute shall be submitted to arbitration pursuant to this Section 12.8(d). Any such dispute shall be arbitrated upon the filing by a Party of a written demand, with notice to the all other Parties, to and under the Commercial Arbitration Rules of the American Arbitration Association (to the extent such rules are not inconsistent with this Section 12.8) in a city selected by the Buyer within one hundred (100) miles of and in the same state in which the Property is located before a panel of three arbitrators. One arbitrator shall be appointed by each of Buyer and Seller with each being appointed within ten days after the American Arbitration Association has given notice of the filing of the demand for arbitration. The two arbitrators so selected, or if such arbitrators are unable to select another arbitrator, the American Arbitration Association, shall select a third arbitrator within five days after the date the latter of the first two arbitrators is selected. Within ten (10) Business Days after receipt of written notice of the Dispute being brought to the arbitrators, all Parties shall submit to the arbitrators their respective position with respect to each issue submitted to the arbitrators for resolution with supporting facts and data. Upon such Dispute being submitted to the arbitrators for resolution, the arbitrators shall assume exclusive jurisdiction over the Dispute, and shall utilize such consultants or experts as they shall deem appropriate under the circumstances, to assist in the resolution of the dispute and will be required to make a final, binding determination, not subject to appeal, within fifteen (15) Business Days of the date of submission. For each issue decided by the arbitrators, they shall award the expenses of the proceeding, including reasonable attorneys' fees, to the prevailing Party or Parties with respect to such issue. In arriving at their decision, the arbitrators shall consider the pertinent facts and circumstances as presented in evidence and be guided by the terms and provisions of this Agreement and applicable law. The arbitrators shall have authority to order the remedies, and only the remedies, set forth in this Agreement. Except as otherwise provided in this Section 12.8(d), the commercial arbitration rules of the American Arbitration Association shall

govern the arbitration. This Agreement and the rights and obligations of the Parties shall remain in full force and effect pending the award in any arbitration proceeding hereunder. This agreement to arbitrate shall be binding upon the successors and assigns of each Party. Either Party may, without inconsistency with this Agreement, seek from any court of competent jurisdiction any interim or provisional relief that may be necessary to protect the rights or property of that Party, pending the result of the arbitration.

(e) Enforcement of Award; Transcript. Any arbitration award may be entered as a judgment in the Federal courts or the courts of the state in which the arbitration is held. A printed transcript of any such arbitration proceeding shall be kept and each of the Parties shall have the right to request a copy of such transcript.

12.9 Survival. This Section 12.9 shall survive the termination of this Agreement.

12.10 Time of the Essence. Time is of the essence of this Agreement.

12.11 Confidentiality. Except for such attorneys, accountants, investment advisors, underwriters, lenders and others as are reasonably required to evaluate and consummate the transaction contemplated by this Agreement, and, except to the extent required by law, all information, studies and reports relating to the property obtained by Buyer, either by the observations and examinations of its agents and representatives or as disclosed to it by Seller, shall remain confidential and if the transaction contemplated herein fails to close for any reason, Buyer shall deliver to Seller, at no cost to Seller, all such information, reports and studies, and Buyer shall make no further distributions or disclosures of any such information, reports and studies. Except to the extent legally required, Buyer and Seller agree that, to the extent reasonably practical, they shall keep the contents of this Agreement confidential and that no publicity or press release to the general public with respect to this transaction shall be made by either party without the prior written consent of the other party.

12.12 No Waiver. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

12.13 Further Acts. Each party shall, at the request of the other, execute, acknowledge (if appropriate) and deliver whatever additional documents, and do such other acts, as may be reasonably required in order to accomplish the intent and purposes of this Agreement.

12.14 Agreement Not to Benefit Third Parties. This Agreement is made for the sole benefit of Seller and Buyer, and no other person shall be deemed to have any privity of contract under this Agreement nor any right to rely on this Agreement to any extent for any purpose whatsoever, nor have any right of action of any kind on this Agreement nor be deemed to be a third party beneficiary under this Agreement.

12.15 Severability. If any provision of this Agreement or its application to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances, other than those to which it is held invalid, shall not be affected thereby and shall be enforced to the furthest extent permitted by law;

provided that the invalidity of such provision does not materially adversely affect the benefits accruing to any party hereunder.

12.16 Damages. In no event shall Section 2.4 of this Agreement limit the damages recoverable by either party against the other party due to (a) the other party's obligation to indemnify such party in accordance with this Agreement, or (b) third party claims.

12.17 Counterparts. This Agreement and all documents and agreements executed in connection herewith may be executed simultaneously or in any number of counterparts, each of which shall be deemed an original as to the party whose signature it bears, but all of which together shall constitute one and the same Agreement.

12.18 Survival of Representations and Warranties. All indemnifications, representations and warranties of Buyer and Seller under this Agreement and in any documents, certificates or statements delivered pursuant hereto shall survive the execution and delivery of the Deed and the transfer of title, or the termination of this Agreement, as set forth herein.

12.19 Form 1099-S. For the purpose of complying with Section 6045 of the Internal Revenue Code of 1986, as amended, Escrow Holder shall be deemed the "person responsible for closing the transaction," and shall be responsible for obtaining information necessary to file with the Internal Revenue Service Form 1099-S (Statement for Recipients of Proceeds From Real Estate, Broker and Barter Exchange Transactions).

12.20 Alquist-Priolo Special Studies Zones Act.   The Broker is required, under the Alquist-Priolo Special Studies Zones Act, to disclose to Buyer whether the Property is located within a delineated special studies zone (a zone that encompasses a potentially or recently active trace of an earthquake fault that is deemed by the State Geologist to be sufficiently active and well defined enough to constitute a potential hazard to structures from surface faulting or fault creep.)  Buyer acknowledges that it will look to the Broker to determine whether the Property is or is not within such a special studies zone, and that the Property's development may require a geologic report from a state registered geologist.

12.21 Commercial Property Earthquake Weakness Disclosure Report.   Buyer acknowledges that the Improvements were constructed prior to 1975 and include structures with pre-cast concrete walls together with wood frame roofs. California law requires that Seller provide Buyer with a copy of The Commercial Property Owner's Guide to Earthquake Safety (the "Booklet") published by the California Seismic Safety Commission.  Buyer hereby informs Seller that the Property meets the foregoing requirements and Seller is required to provide Buyer with a copy of the Booklet.  Buyer agrees to instruct the Broker to provide Seller with a copy of the Booklet  within fifteen days of the date of this Agreement.  Seller shall, within five (5) business days of the Approval Date, deliver to Buyer a copy of the Booklet and a completed "Commercial Property Earthquake Weakness Disclosure Report" contained in the Booklet  duly executed by Seller (the "Disclosure Report").  Within five (5) business days of Buyer's receipt of the Disclosure Report, Buyer shall deliver a duly countersigned copy of the same to Escrow Holder, with a copy to Seller.  Escrow Holder is hereby instructed that the Escrow shall not close unless and until Escrow Holder has received the Disclosure Report duly signed by both Seller and Buyer.  Buyer hereby acknowledges receipt of the Booklet.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Seller:             MITSUBISHI SILICON AMERICA, a California corporation
                    By: _____
                    Name: __Krishna Rao_____
                    Title: _Chief Financial Officer_____

Buyer:              INTEGRIS/MELLENIUM JOINT VENTURE, LLC. A California
                    limited liability company

                    By: ___Integris_____
                    A __Shareholder_____

                    By: _____
                    Name: __Loren Baxter_____
                    Title: __Sole Owner_____

JUN-30-1999  08:47          5033156590          96%

## EXHIBIT A

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

_____ Integris/Millenium Joint Venture LLC_____
_____ 120 Independence Dr._____
_____ Menlo Park, CA 95025_____

GRANT DEED

FOR VALUE RECEIVED, MITSUBISHI SILICON AMERICA, a California corporation, grants to Integris/Millennium Joint Venture LLC, a California Limited Liability Company "Grantee"), all that certain real property (the "Property") situated in the City of Menlo Park, County of San Mateo, State of California, described on Schedule 1 attached hereto and by this reference incorporated herein.

THE PROPERTY IS CONVEYED TO GRANTEE SUBJECT TO:

(a) All liens, encumbrances, easements, covenants, conditions and restrictions of record, including any matters shown on any subdivision or parcel map affecting the Property;

(b) All exceptions appearing in a certain policy of title insurance for the Property issued to the Grantee as of the date hereof;

(c) All matters which would be revealed or disclosed in an accurate survey of the Property;

(d) All matters which would be revealed or disclosed by a physical inspection of the Property;

(e) A lien not yet delinquent for taxes for real property and personal property, and any general or special assessments against the Property; and

(f) Zoning ordinances and regulations and any other laws, ordinances, or governmental regulations restricting or regulating the use, occupancy or enjoyment of the Property.

IN WITNESS WHEREOF, the undersigned has executed this Grant Deed dated as of _____, 19__.

MITSUBISHI SILICON AMERICA, a California corporation
By: _____
Name: _____
Title: _____

JUN-30-1999  08:48                    5033156590                    96%

056
P.13

# SCHEDULE 1

LEGAL DESCRIPTION OF REAL PROPERTY

County of San Mateo Assessor's Parcel # 055-170-240 and # 055-170-250 commonly known as
3705, 3715, and 3723 Haven Ave., Menlo Park, California

JUN-30-1999  08:48                5033156590                 96%

# EXHIBIT B

## ASSIGNMENT OF INTANGIBLE PROPERTY

THIS ASSIGNMENT OF INTANGIBLE PROPERTY (this "Assignment") is made as of _____, 199_, by MITSUBISHI SILICON AMERICA, a California corporation ("Assignor"), does hereby sell and convey to INTEGRIS/MILLENNIUM JOINT VENTURE, a California limited liability company ("Assignee").

### WITNESSETH:

WHEREAS, Assignor is contemporaneously herewith selling pursuant to that certain Purchase and Sale Agreement dated as of _____, 199_, by and between Assignor and Assignee (the "Purchase Agreement") that certain real property more particularly described on Schedule 1 attached hereto and incorporated herein. Terms used in this Assignment and not otherwise defined shall be given the meanings defined in the Purchase Agreement.

WHEREAS, Assignor desires to assign its interest in and to the following to Assignee as of the date on which title to the Real Property is vested in Assignee (the "Transfer Date").

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

I.    As of the Transfer Date, Assignor hereby assigns and transfers unto Assignee all of its right, title, claim and interest in, to and under the (a) "Warranties and Guarantees"; (b) "Names and Marks"; (c) "Intangible Property"; (d) "Permits"; and (e) Third Party Claims (collectively the "Assigned Interests").

II.    The following terms shall have the following meanings:

A. The term "Warranties and Guaranties" as used herein shall mean and include all warranties and guarantees to the extent assignable, whether or not written, for all or any portion of the Property, including without limitation the Improvements and the Personal Property, including without limitation construction warranties from contractors and subcontractors.

B. The term "Names and Marks" as used herein shall mean and include all patents, licenses, trademarks, service marks and names used in connection with the operation of the Property, and all symbols, emblems and logos used in connection with the ownership or operation of the Property, whether in black and white or in color, and irrespective of size, and all of Assignor's right, title and interest in and to all goodwill associated therewith.

C. The term "Intangible Property" as used herein shall mean and include all intangible property relating to or used in connection with the Property, as defined in the Purchase Agreement.

D.   The term "Permits" as used herein shall mean and include all governmental permits and approvals relating to the construction, operation, use or occupancy of the Property.

E.   The term "Third Party Claims" as used herein shall mean any and all claims that Assignor may have against independent contractors of Assignor who generated any of Seller's Documents, that arise out of the errors or omissions of such persons.

III.  Assignment shall be binding on and inure to the benefit of Assignee and Assignor, and their respective heirs, executors, administrators, successors-in-interest and assigns.

IN WITNESS WHEREOF, Assignor has executed this Assignment as of the date first above written.

Assignor:     MITSUBISHI SILICON AMERICA, a California corporation
Seller:

By: _____
Name: __Krishna Rao_____
Title: _Chief Financial Officer_____

Assignee:     INTEGRIS/MELLENIUM JOINT  VENTURE, LLC.
              A California limited liability company

Buyer:
By: ____Integris_____
A __Shareholder_____

By: _____
Name: __Loren Baxter_____
Title: ___Sole Owner_____

## Schedule 1

## LEGAL DESCRIPTION OF REAL PROPERTY

County of San Mateo Assessor's Parcel # 055-170-240 and # 055-170-250 commonly known as 3705, 3715, and 3723 Haven Ave., Menlo Park, California

## Schedule 2

## INTANGIBLE PROPERTY

## EXHIBIT C

## BILL OF SALE

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, **MITSUBISHI SILICON AMERICA**, a California corporation ("Seller"), does hereby sell and convey to INTEGRIS/MILLENNIUM JOINT VENTURE, LLC ("Buyer"), all of its right, title and interest in and to the personal property described in Schedule 1 attached hereto (the "**Personal Property**").

Notwithstanding any prior or contemporaneous oral or written representations, statements, documents or understandings, Seller makes only those representations and warranties, if any, with respect to the Personal Property that are expressly set forth in that certain Purchase and Sale Agreement dated _____ between Seller and Buyer (the "**Agreement**").

Buyer hereby acknowledges receipt of the Personal Property and further acknowledges that it is receiving such Personal Property in an "As Is" condition with only those warranties, if any, that are expressly set forth in the Agreement.

Buyer hereby agrees to assume and be bound by any and all of Seller's obligations, duties and liabilities arising on or after the date hereof in connection with any and all of the assets of Seller intended to be transferred and conveyed hereby.

//

//

//

//

//

//

JUN-30-1999  08:49                          5033156590                       96%        **062**
                                                                                        P.19

**IN WITNESS WHEREOF**, the parties hereto have executed this Bill of Sale as of
_____, 19___.

Seller:          **MITSUBISHI SILICON AMERICA**, a California corporation

                 By: _____
                 Name: __Krishna Rao_____
                 Title: _Chief Financial Officer_____

Buyer:           **INTEGRIS/MILLENNIUM JOINT VENTURE, LLC.**

                 By: _____Integris_____
                 A __Shareholder_____

                 By: _____
                 Name: __Loren Baxter_____
                 Title: ___Sole Owner_____

JUN-30-1999  08:49                    5033156590                    96%

**063**
P.20

## SCHEDULE 1

## LEGAL DESCRIPTION OF REAL PROPERTY

County of San Mateo Assessor's Parcel # 055-170-240 and # 055-170-250 commonly known as 3705, 3715, and 3723 Haven Ave., Menlo Park, California.

JUN-30-1999  08:49                    5033156590                    96%

# EXHIBIT D

## DESCRIPTION OF DOCUMENTS DELIVERED BY SELLER TO BUYER

RESULTS OF ADDITIONAL INVESTIGATIONS AND TESTING –
3695-3723 Haven Avenue Menlo Park, California – June 1997

RESULTS OF SAMPLING AND ANALYSIS –
3645 and 3665 Haven Avenue Property Menlo Park, California

Discussion Items During Meeting of 23 July 1998 –
3695-3723 Haven Avenue Property Menlo Park, California

JUN-30-1999  08:49                    5033156590                    96%        065
                                                                               P.22

## LIST OF EXHIBITS

Exhibit A:   Form of Grant Deed

Exhibit B:   Form of Bill of Sale

Exhibit C:   Form of Assignment of Intangibles

Exhibit D:   Description of Documents Delivered by Seller to Buyer

JUN-30-1999  08:49

96%

066
P.23

# EXHIBIT 2



EDMUND G. BROWN JR.
GOVERNOR

MATTHEW RODRIQUEZ
SECRETARY FOR
ENVIRONMENTAL PROTECTION

**California Water Boards**

**San Francisco Bay Regional Water Quality Control Board**

June 16, 2014
File No. 41S0105 (RL)

SUMCO Phoenix Corp.
Attn: Mr. Jeffrey Bradshaw
19801 North Tatum Boulevard
Phoenix, AZ 85050

RE:   No Further Action Required at the former Siltec site located at 3695-3723 Haven Avenue,
      Menlo Park, San Mateo County

Dear Mr. Bradshaw:

This letter confirms the completion of a site investigation and corrective action for the subject site.
Thank you for your cooperation throughout this investigation.

This letter responds to the December 31, 2013, "Summary of Environmental Conditions, and
Request for Declaration of No Further Active Remediation Status" prepared by Erler & Kalinowski,
Inc. (EKI) on behalf of SUMCO Phoenix Corp. ("SUMCO") for the former Siltec facility located at
3695-3723 Haven Avenue, Menlo Park, in San Mateo County (Site).  This request was based on an
evaluation of the criteria specified in the Regional Water Board's July 31, 2009, "Assessment Tool
for Closure of Low Threat Chlorinated Solvent Sites."  As explained below, we conclude that no
further action is necessary at the Site.  I also concur with your request to properly abandon
groundwater monitoring wells on-site, and on the off-site downgradient 3750 Haven Avenue
property, except for the two on-site shallow monitoring wells MW-8 and MW-9, which are to be
monitored by the current Site owner pursuant to the terms of the existing Deed Restrictions.  You
are requested to provide documentation within 30 days after the proper abandonment of these wells.

**Summary of Site Investigation and Remediation**

The Site is comprised of three commercial buildings and was formerly used for semiconductor
manufacturing which resulted in adverse impact of subsurface soil and groundwater by volatile
organic compounds (VOCs), principally trichloroethene (TCE) and cis-1,2-dichloroethene (cis-1,2-
DCE).  Due to the close proximity to former salt ponds, groundwater in the area has extremely
elevated salinity and is not suitable for municipal supply.  Extensive investigations of on-site and
off-site soil and groundwater have been conducted from 1994 through 2012.  Risk-based cleanup
goals were developed as part of the 1999 Feasibility Study/Remedial Action Plan (FS/RAP)
prepared by EKI.  Remedial options were evaluated, including a pilot study of in-situ chemical
oxidation using potassium permanganate injection.  Ultimately, in-situ treatment did not achieve

SUMCO Phoenix Corp.                                    - 2 -

targeted reductions in VOC concentrations, and Site remediation was accomplished in 1999 through excavation and removal of impacted soil that exceeded risk-based cleanup goal.

In accordance with the FS/RAP, approximately 2,860 cubic yards of VOC-impacted soil were excavated from the Site and the adjacent 3645 and 3665 Haven Avenue properties to the northwest. The excavation was backfilled with a multilayered mixture of materials intended to inhibit movement of VOC vapors from groundwater into the clean fill.  As part of the excavation effort, the building in the middle (Building No. 2 at 3715 Haven Avenue) was demolished and a new two-story building was constructed south of the former Building 2 footprint, outside of the high groundwater risk area.  A paved parking lot currently occupies this soil remediation area.

SUMCO and its predecessors have conducted groundwater monitoring for 13 years since Site source excavation, using on-site and off-site downgradient wells.  Based on the available data, VOCs in groundwater have migrated off-site to the east and northeast, but the concentrations of chemicals of concern in groundwater have stabilized or declined over this time period through natural attenuation process.  Shallow soil vapor sampling conducted by SUMCO's predecessors in 1999 near the commercial building on the adjacent downgradient property to the east (3750 Haven Avenue) did not detect chemicals of concern originated from the Site above laboratory reporting limits.

Currently, Building 2 (3715 Haven Avenue) is owned by Deerfield Realty, and Buildings 1 (3695-3705 Haven Avenue) and 3 (3721-3723 Haven Avenue) are owned by Integris Millennium Joint Venture LLC (Integris).  A Risk Management Plan (RMP) was prepared and incorporated into a 1999 Covenant (a.k.a. Deed Restriction) between the Site owner and the Regional Water Board.  In addition to specific measures to protect human health risk from residual contamination in the groundwater, the RMP also requires the performance of groundwater monitoring in certain on-site wells, and evaluation of changing Site and regulatory conditions, by the Site owner.  SUMCO sampled the two on-site shallow (A-zone) wells MW-8 and MW-9 from 1999 through 2004, during which time the concentrations remained below site-specific risk-based screening levels.  After 2004, Regional Water Board approved SUMCO's proposal to discontinue monitoring of these wells and they have not been sampled by the current owner since 2004.  Based on the 2004 groundwater data, 95 and 3,300 µg/l of TCE remain in the sample collected from MW-8 and MW-9, respectively, which are lower than the site specific screening levels.

**Conclusion**

Based on our review, we conclude that the Site meets the Water Board's criteria for a low-threat chlorinated solvent site.  Remedial actions implemented to date have effectively removed the source and resulted in stabilized and improving groundwater condition.  Further remedial actions will have marginal effect and it is anticipated that groundwater quality will further improve over time due to natural attenuation processes.  There is an isolated pocket of elevated TCE concentrations in groundwater near MW-9 based on 2004 sampling result, which is above the existing Regional Water Board's Environmental Screening Levels (ESLs) for commercial land use.  However, MW-9 is located outside of existing building footprint areas and the detected TCE concentrations were

SUMCO Phoenix Corp.                              - 3 -

below the site-specific risk-based screening levels.  Based on groundwater data since 2004 from other monitoring wells at the Site, it is reasonable to expect that current TCE concentrations at MW-9 have also decreased significantly from its 2004 level.

Based on information in the above-referenced file and with the provision that the information provided to this agency was accurate and representative of site conditions, I conclude that no further action is necessary at the subject Site.  Any risk associated with residual contamination can be adequately managed by the RMP and the deed restrictions.  However, in the event the current or future land owner(s) proposes a more sensitive land use at the Site, we will require the use of up-to-date groundwater information, especially near the MW-9 area, to evaluate the risk before any revision of the deed restrictions can be granted.

If you have any questions concerning this letter, please contact Randy Lee of my staff at (510) 622-2375, [e-mail: rylee@waterboards.ca.gov].

Sincerely,

Digitally signed by Stephen Hill
Date: 2014.06.16 12:41:37 -07'00'

Bruce H. Wolfe
Executive Officer


Attachment:  Case Closure Summary
cc w/ attachment:  Mailing List (next page)

SUMCO Phoenix Corp.                           - 4 -

Mailing List:

Mr. Charles Ice
San Mateo County
Environmental Health Division
2000 Alameda de las Pulgas, Suite 100
San Mateo, CA 94403
cice@co.sanmateo.ca.us

Deerfield Realty
Attn: Mr. Tito Bianchi
3715 Haven Avenue
Suite 210
Menlo Park, CA 95025

Integris Millennium Joint Venture LLC
Attn: Mr. Gary William
2401 Waterman Blvd, Suite A4
Fairfield, CA  94534
gilliams@yahoo.com

Dr. Carey Peabody
Erler & Kalinowski, Inc.
1870 Ogden Drive
Burlingame, CA 94010
cepeabody@EKICONSULT.COM

Jeff Shaw
Erler & Kalinowski, Inc.
1870 Ogden Drive
Burlingame, CA 94010
jshaw@ekiconsult.com

# CASE CLOSURE SUMMARY

## I. AGENCY INFORMATION

Date: June 12, 2014

| | |
|---|---|
| *Agency Name*:  SF Bay Regional Water Quality Control Board ("RWQCB") | *Address*:  1515 Clay Street, Suite 1400 |
| *City/State/Zip*:  Oakland, CA  94612 | *Phone*: 510-622-2300 |
| *Responsible Staff Person*:      Randy Lee | *Title*:  Water Resource Control Engineer |

## II. SITE INFORMATION

| | | | | |
|---|---|---|---|---|
| *Site Facility Name*:      former Siltec facility | | | | |
| *Site Facility Address*:  3695-3723 Haven Avenue, Menlo Park, San Mateo County | | | | |
| *RB Case No.*:  41S0186 | *Local Case No.*: | | *Priority*: | |

**Responsible Parties (include addresses and phone numbers)**

SUMCO Phoenix Corp.  Attn: Mr. Jeffrey Bradshaw, Dir. Env. Health & Safety

19801 North Tatum Boulevard

Phoenix, AZ  85050

(480) 473-6503

| *Tank No.* | *Size in Gallons* | *Contents* | *Closed In—Place/Removed?* | *Date* |
|---|---|---|---|---|
| n/a | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### III. RELEASE AND SITE CHARACTERIZATION INFORMATION

| | | |
|---|---|---|
| *Cause and Type of Release*: Release to soil and groundwater associated with manufacture of silicon wafers | | |
| *Site characterization complete?*  Yes | *Date Approved by Oversight Agency:*    March 1999 | |
| *Monitoring wells installed?*  Yes | *Number:* 6 onsite, 4 offsite, 3 destroyed | *Proper screened interval?*  Yes |
| *Highest GW Depth Below Ground Surface:* 4.11 | *Lowest Depth:*  9.00 | *Flow Direction:* E - ENE |
| *Most Sensitive Current Use:*  Commercial office | | |
| *Most Sensitive Potential Use and Probability of Use:*    Only commercial/industrial land use allowed on Site, by deed restriction. Surrounding properties used for commercial/industrial purposes. | | |
| *Are drinking water wells affected?*  No | *Aquifer Name:*  n/a | |
| *Is surface water affected?*   No | *Nearest surface water name:*  un-named channelized creek | |
| *Off-Site Beneficial Use Impacts (Addresses/Locations):*  Minimal (see Sections IV and VI, below) | | |
| *Report(s) on file?*  Yes | *Where is report(s) filed?*    Water Board | |

| TREATMENT AND DISPOSAL OF AFFECTED MATERIAL | | | |
|---|---|---|---|
| *Material* | *Amount* (Include Units) | *Action (Treatment or Disposal w/Destination)* | *Date* |
| Tanks | n/a | n/a | |
| Piping | n/a | n/a | |
| Free Product | n/a | n/a | |
| Soil | 2860 cu. yd. | Disposal at Allied Waste Forward Landfill, Stockton, CA | 1999-2001 |
| Groundwater | n/a | n/a | |
| Barrels | n/a | n/a | |

### III. RELEASE AND SITE CHARACTERIZATION INFORMATION (Cont'd)

| MAXIMUM DOCUMENTED POLLUTANT CONCENTRATIONS—BEFORE AND AFTER CLEANUP | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| POLLUTANT | Soil (ppm) | | Water (ppb) | | POLLUTANT | Soil (ppm) | | Water (ppb) | |
| | Before[a] | After[b] | Before[a] | After[c] | | Before[a] | After | Before[a] | After[c] |
| Trichloroethene | 40 | 3.2 | 260,000 | 3,300 | 1,1-Dichloroethane | 0.38 | (d) | 140 | ND <50 |
| cis-1,2-Dichloroethene | 51 | (d) | 25,000 | 1,100 | Tetrachloroethene | 0.073 | (d) | 46 | ND <50 |
| CFC-113 (1,1,2-Trichloro-1,2,2-trifluoroethane) | 11 | (d) | 12,000 | 1,900 | Methylene Chloride | n/a | (d) | 32 | ND <500 |
| Carbon Tetrachloride | 0.021 | (d) | 2,300 | ND <50 | 1,1,1-Trichloroethane | n/a | (d) | 27 | ND <50 |
| Vinyl Chloride | 0.56 | 0.075 | 1,400 | 75 | Toluene | n/a | (d) | 6.6 | ND <5 |
| Chloroform | 0.016 | (d) | 1,000 | 28 | 1,2-Dichloroethane | n/a | (d) | 5 | ND <50 |
| Benzene | n/a | (d) | 460 | ND <5 | trans-1,2-Dichloroethene | 0.11 | (d) | 1.6 | ND <50 |
| 1,1-Dichloroethene | n/a | (d) | 270 | ND <50 | | | | | |

**Comments:**
Excavation was performed in 1999-2001 to a maximum depth of approximately 6 feet below ground surface, i.e., approximately one foot above groundwater (EKI, 2000; EKI, 2001). Deeper excavation into the capillary fringe or saturated zone was not practicable.

**Notes:**
(a) Listed pre-excavation VOC concentrations in soil and groundwater are from EKI (1999).

(b) Post-excavation soil sampling was not required by the RWQCB. Soil was excavated to approximately one foot above groundwater, and lateral excavation boundaries were pre-determined, based on soil sampling prior to excavation. Excavation boundaries enclosed soil samples with VOCs above risk-based screening levels, and were extended to include soil samples with VOCs above reporting limits but below screening levels, as a conservative measure (EKI, 2000). Of the chemical species detected on-Site, risk drivers were trichloroethene and vinyl chloride. Values shown above, in the soil post-excavation column, are the risk-based maximum soil screening levels for VOCs used to demarcate excavation boundaries. These data do not represent analytical results for confirmation soil samples.

(c) Post-remediation VOC concentrations in groundwater are the maximum analytical values from the three most recent sampling events for each well (EKI, 2013). All maximum post-remediation concentrations listed (except benzene and toluene) are analytical results of samples collected from on-site A-zone well MW-9, most recently sampled in 2004 (EKI, 2013).

(d) The risk-based soil screening level for this chemical was greater than the maximum observed concentration, thus its distribution did not influence cleanup goals or excavation boundaries.

3

## IV.  CLOSURE

| | | |
|---|---|---|
| *Does completed corrective action protect existing beneficial uses per the Regional Board Basin Plan?* | | |
| Yes.  Current listed beneficial uses include MUN, PROC, and IND for groundwater.  Given the extreme salinity of groundwater at and around the Site, such uses currently are not possible.  Nevertheless, VOC concentrations are expected to continue to decline over time, such that such beneficial uses could be possible in the absence of high salinity in groundwater. | | |
| *Does completed corrective action protect potential beneficial uses per the Regional Board Basin Plan?* | | |
| Yes.  Potential beneficial uses include AGR for groundwater.  Given elevated salinity of groundwater at and around the Site, such use is not currently possible.  Nevertheless, VOC concentrations are expected to continue to decline over time such that such a beneficial use could be possible in the absence of high salinity in groundwater. | | |
| *Does corrective action protect public health for current land use?*  Yes | | |
| *Site Management Requirements:* | | |
| Site activities must be managed in accordance with the Risk Management Plan, dated 12 March 1999, recorded 9 August 1999, County of San Mateo, California; Document no. 1999-135815. | | |
| *Monitoring Wells Decommissioned:* | *Number Decommissioned:* | *Number Retained:* 2 on-site shallow wells to be retained |
| *List Enforcement Actions Taken:*  None | | |
| *List Enforcement Actions Rescinded:*  N/A | | |

## V.  TECHNICAL REPORTS, CORRESPONDENCE, ETC., THAT THIS CLOSURE RECOMMENDATION WAS BASED UPON

EKI, 1999, *Feasibility Study and Remedial Action Plan, 3695-3723 Haven Avenue, Menlo Park, California.* Erler and Kalinowski, Inc., 12 March 1999.

EKI, 2000, *Remedial Excavation Summary Report, 3695-3723 Haven Avenue Site, Menlo Park, California.*  Erler & Kalinowski, Inc., 5 May 2000.

EKI, 2001, *Remedial Excavation Summary Report Addendum, 3695-3723 Haven Avenue Site, Menlo Park, California.* Erler & Kalinowski, Inc., 18 April 2001.

EKI, 2004, *Five-Year Review of Groundwater Monitoring Data and Proposal for Modification of Ongoing Groundwater Monitoring Program, 3695-3750 Haven Avenue, Menlo Park, California.*  Erler & Kalinowski, Inc., 23 November 2004.

EKI, 2013, *Summary of Environmental Conditions and Request for Declaration of No Further Active Remediation Status, 3695-3723 Haven Avenue, Menlo Park, California.*  Erler & Kalinowski, Inc., 31 December 2013.

## VI.   ADDITIONAL COMMENTS, DATA, ETC.

EKI (2013) presents a comprehensive summary of the land use history, physical characteristics, former and current chemical concentrations, and remediation activities completed at the 3695-3723 Haven Avenue property ("Site"). Also presented are a description of administrative and engineering controls implemented to address potential future risks presented by residual concentrations of VOCs at the Site, and an analysis of concentration trends and potential fate and transport of VOCs in groundwater at the Site, and downgradient of the Site.

The Site Risk Management Plan ("RMP") is presented in EKI (1999), and is attached to a Covenant and Environmental Restriction on the Property (i.e., a "deed restriction"), between the RWQCB and the property owner. The deed restriction and RMP detail the responsibilities of current and future owners of the Site for environmental monitoring and risk management, and prohibits certain land uses (e.g., water wells, day-care facilities, and others) that could potentially introduce or complete exposure pathways to future Site users. The deed restriction is recorded in the Official Records of San Mateo County and obligates current and future owners to specific actions to protect human health at the Site.

The Site meets RWQCB's criteria for a low-threat chlorinated solvent site. Additional environmental monitoring and remediation by SUMCO would not be productive, given the following:

- VOC concentrations in soil, groundwater, and soil vapor at and near the Site have been characterized;
- Source removal has been implemented;
- Engineering and administrative controls have been designed and implemented;
- Thirteen years of groundwater monitoring have been completed;
- VOC concentration trends in the off-Site VOC plume in groundwater are stable to declining;
- Off-site VOC concentrations are well below appropriate Environmental Screening Levels;
- The VOC plume poses minimal to no threat to existing and potential uses of groundwater;
- Movement of VOCs in groundwater to marine water of San Francisco Bay is expected to take centuries to millennia;
- The most recent on-Site VOC groundwater concentration data were below Site-specific risk-based cleanup levels; and
- Under the RMP and deed restriction between the Site owner and the RWQCB, the Site owner is required to monitor on-Site VOC concentrations and perform certain other actions to manage risk at the property; SUMCO is not a party to the RMP or deed restriction.

**This document and the related CASE CLOSURE LETTER shall be retained by the lead agency as part of the official site file.**

# EXHIBIT 3





## Water Boards

San Francisco Bay Regional Water Quality Control Board

June 11, 2019
File No: 41S0211 and 41S105 (PF)

SUMCO Phoenix Corp.
Attn: Brian Beetso
19801 North Tatum Boulevard
Phoenix, AZ 85050

Integris Millennium Joint Venture, LLC
Mr. Gary Williams
2401 Waterman Blvd., Suite A4
Fairfield, CA 94534
gwilliams@yahoo.com

SUBJECT:   Property at 3723 Haven Avenue, Menlo Park, San Mateo County -
Requirement for Site Investigation

Dear Mr. Beetso and Mr. Williams:

This letter notifies you that the property at 3723 Haven Avenue in Menlo Park (Site) closed
by the Water Board in 2014 (as part of the former Siltec Site) is being reopened due to
changed site conditions and planned redevelopment. Additional environmental
investigations are needed to assess the nature and extent of groundwater and soil vapor
contamination at the Site, and it is expected that additional remedial actions will be needed
to reduce contaminant concentrations for site redevelopment.

**Site Background**
The 3723 Haven Avenue property is situated at the northernmost part of the previously
closed Siltec Site (3695–3723 Haven Avenue). In 1999, nearly 3,000 cubic yards of
volatile organic compound (VOC) impacted soils were excavated and removed from 3715
Haven Avenue and adjacent properties to the northwest.

In August 1999, a covenant and environmental restriction was recorded for the Siltec
property, and this restriction allows site development for only industrial, commercial and
office space use. No residences for human habitation, no hospitals, no schools or day care
centers are permitted on the property. The deed restriction further required groundwater
monitoring and compliance with a Risk Management Plan developed for the property. The
groundwater monitoring requirement was removed in 2004.

A "No Further Action" letter was issued for the Siltec Site on June 16, 2014, based on the
Regional Water Board's Assessment Tool for Closure of Low Threat Chlorinated Solvent

- 2 -

Sites. Data collected from groundwater monitoring conducted at the site for over 13 years indicated that the volatile organic compounds in groundwater had migrated off site, but the concentrations of chemicals of concern (primarily trichloroethylene and cis-1,2 dichloroethene) were considered "stable and declining" due to natural attenuation.

**Current Situation**
FPG Development plans to construct a 9-story building with parking on the first four levels, and hotel rooms on the top 4 levels. Previously the site was cleaned up (by SUMCO) for commercial and industrial uses; plans for site redevelopment as a hotel requires more stringent (residential) cleanup levels for TCE than previously anticipated; and TCE toxicity was recently reassessed resulting in lower environmental screening levels for this contaminant.

FPG Development Group voluntarily conducted site investigations in 2018 and 2019, with no directive issued by the Water Board. Results of environmental investigations were reported in AWR's *Environmental Sampling Report* for 3723 Haven Ave in Menlo Park (Report), dated April 2019. Groundwater data from 2018/2019 indicate that the VOC plume is not stable; specifically, concentrations of trichloroethylene (TCE) in MW-8 increased nearly two orders-of-magnitude from 2004 levels. In addition, elevated concentrations of TCE and vinyl chloride were detected in 2019 soil vapor samples collected at locations SV-1 and SV-2 (approximately 40 to 60 feet from MW-8).

The potential for TCE in groundwater to impact soil vapor and indoor air via vapor intrusion is unknown because the groundwater plume is unstable and lateral extents of impacted groundwater and soil vapor have not been delineated. Additional investigations are needed to delineate the lateral extent of impacted groundwater and soil vapor. Reported TCE concentrations in groundwater exceed the current Maximum Contaminant Levels and Environmental Screening Levels for vapor intrusion and therefore may require further remedial action to reduce these concentrations to levels protective of human health and the environment.

**Report Requirement**
You are required to submit a workplan containing the following information by **July 31, 2019:**

1. Plans to investigate and evaluate the lateral extent of Volatile Organic Compounds (VOCs) in groundwater and soil vapor at the Site.
2. Report results of any unreported site investigations
3. Schedule for implementing investigations

This requirement for a report is made pursuant to Water Code Section 13267, which allows the Regional Water Board to require technical or monitoring program reports from any person who has discharged, discharges, proposes to discharge, or is suspected of discharging waste that could affect water quality. The attachment provides additional information about Section 13267 requirements. Any extension in the above deadline must be confirmed in writing by Regional Water Board staff.

- 3 -

In addition to a hard copy you are also required to submit all documents in electronic format to the State Water Resources Control Board's GeoTracker database pursuant to the California Code of Regulations (Title 23, Section 3890 et.seq.). Guidance for electronic information submittal is available at: http://www.waterboards.ca.gov/water_issues/programs/ust/electronic_submittal/. Please note that this requirement includes all analytical data, monitoring well latitudes, longitudes, elevations, water depth, site maps, and boring logs (PDF format).

If you have any questions, please contact Phyllis Flack of my staff at (510) 622-2420 or phyllis.flack@waterboards.ca.gov.

Sincerely,

Digitally signed by Stephen Hill
Date: 2019.06.11 11:45:51
-07'00'

Michael Montgomery
Executive Officer

Attachment: Section 13267 Fact Sheet

cc w/attachment:

Richard A. Mielbye, FPG Development Group (rmielbye@fpg-corp.com)
Ken Price, AWR Corporation (kprice@awrcorp.net)
Tyson Fulmer, AWR Corporation (tfulmer@awrcorp.net)





San Francisco Bay Regional Water Quality Control Board

## Fact Sheet – Requirements for Submitting Technical Reports
## Under Section 13267 of the California Water Code

**What does it mean when the Regional Water Board requires a technical report?**
Section 13267[1] of the California Water Code provides that "...the regional board may require that any person who has discharged, discharges, or who is suspected of having discharged or discharging, or who proposes to discharge waste...that could affect the quality of waters...shall furnish, under penalty of perjury, technical or monitoring program reports which the regional board requires."

**This requirement for a technical report seems to mean that I am guilty of something, or at least responsible for cleaning something up. What if that is not so?**
The requirement for a technical report is a tool the Regional Water Board uses to investigate water quality issues or problems. The information provided can be used by the Regional Water Board to clarify whether a given party has responsibility.

**Are there limits to what the Regional Water Board can ask for?**
Yes. The information required must relate to an actual or suspected or proposed discharge of waste (including discharges of waste where the initial discharge occurred many years ago), and the burden of compliance must bear a reasonable relationship to the need for the report and the benefits obtained. The Regional Water Board is required to explain the reasons for its requirement.

**What if I can provide the information, but not by the date specified?**
A time extension may be given for good cause. Your request should be promptly submitted in writing, giving reasons.

**Are there penalties if I don't comply?**
Depending on the situation, the Regional Water Board can impose a fine of up to $5,000 per day, and a court can impose fines of up to $25,000 per day as well as criminal penalties. A person who submits false information or fails to comply with a requirement to submit a technical report may be found guilty of a misdemeanor. For some reports, submission of false information may be a felony.

**Do I have to use a consultant or attorney to comply?**
There is no legal requirement for this, but as a practical matter, in most cases the specialized nature of the information required makes use of a consultant and/or attorney advisable.

**What if I disagree with the 13267 requirements and the Regional Water Board staff will not change the requirement and/or date to comply?**
You may ask that the Regional Water Board reconsider the requirement, and/or submit a petition to the State Water Resources Control Board. See California Water Code sections 13320 and 13321 for details. A request for reconsideration to the Regional Water Board does not affect the 30-day deadline within which to file a petition to the State Water Resources Control Board.

**If I have more questions, whom do I ask?**
Requirements for technical reports include the name, telephone number, and email address of the Regional Water Board staff contact.

*Revised March 2014*

[1] All code sections referenced herein can be found by going to http://leginfo.legislature.ca.gov/faces/codes.xhtml

DR. TERRY F. YOUNG, CHAIR | MICHAEL MONTGOMERY, EXECUTIVE OFFICER

1515 Clay St. Suite 1400, Oakland CA 94612 www.waterboards.ca.gov/sanfranciscobay

♻ RECYCLED PAPER





## Water Boards

San Francisco Bay Regional Water Quality Control Board

September 9, 2019
File No. 41S0211 and 41S105 (PF)

SUMCO Phoenix Corp.
Attn: Jeff Homer
19801 North Tatum Boulevard
Phoenix, AZ 85050
jeff.homer@sumcousa.com

Integris Millennium Joint Venture, LLC
Mr. Gary Williams
2401 Waterman Blvd., Suite A4
Fairfield, CA 94534
gilliams@havenoffices.com

Subject:   **Approval of Workplan and Requirement for Completion Report – 3723
Haven Avenue, Menlo Park, San Mateo County**

Dear Mr. Williams and Mr. Homer:

This letter responds to AWR's August 12, 2019 Revised Site Investigation Workplan.
(Workplan) for the above referenced Site. As explained below, I approve the Workplan
and require you to submit a completion report by November 1, 2019.

**Background**
FPG Development Group plans to construct a 9-story building on the Site with parking
on the first four levels and hotel rooms on the top 4 levels. Recent data collected
indicated that a volatile organic compounds (VOCs) in groundwater, originally thought to
be stable and degrading have migrated from 3715 Haven Avenue onto the property
proposed for redevelopment (3723 Haven Avenue). The Water Board's June 11, 2019
directive letter (Directive) required that you submit a Workplan to address additional
investigations needed to assess the nature and extent of groundwater and soil vapor
contamination at the Site by July 31, 2019. The workplan developed by AWR was
submitted on behalf of both identified responsible parties: SUMCO Phoenix Corp.
(SUMCO) and Integris Millennium Joint Venture, LLC (Integris).

The Workplan scope includes installing two temporary soil vapor wells at a 4-foot depth
(just above the water table) and soil vapor sample collection from these wells. Grab
groundwater samples will be collected from three locations within the shallow saturated
zone (B-zone, 20 feet below ground surface) and three locations within the deeper

MICHAEL MONTGOMERY, EXECUTIVE OFFICER

1515 Clay St., Suite 1400, Oakland, CA 94612 | www.waterboards.ca.gov/sanfranciscobay

♻ RECYCLED PAPER

Case # 41S0211 and 41S01105

saturated zone (C-zone, 30 feet below ground surface). All samples will be analyzed, and data will be reported.

**Approval of Workplan**
The Workplan satisfies the requirements of our Directive. I approve it.

**Requirement for Completion Report**
SUMCO and Integris are required to submit a completion report by November 1, 2019. The report shall document completion of the approved workplan tasks and present implementation results. The report should include the following element(s):

- A site figure providing boring and sample locations
- Data tables summarizing data collected
- Laboratory analytical data packages
- Update to the site conceptual model, including plume maps for soil vapor and groundwater
- Recommendations for future investigations and/or remedial actions
- Schedule for future actions and property redevelopment.

SUMCO and Integris are required to submit all documents in electronic format to the State Water Resources Control Board's GeoTracker database, pursuant to the California Code of Regulations (Title 23, Section 3890, et.seq.). Guidance for electronic information submittal to GeoTracker is available at: http://www.waterboards.ca.gov/water_issues/programs/ust/electronic_submittal/. Please note that this requirement includes all analytical data, monitoring well information (latitudes, longitudes, elevations, and water depth), site maps, and boring logs.

**Basis for Requirement**
The information required in this report is needed to determine the current extent of the groundwater contamination plume and determine whether subsurface contamination poses a threat to human health through the vapor intrusion pathway.

Integris is named in its capacity as the current landowner. SUMCO is named in its capacity as the past landowner and operator during the period when the release likely occurred.

This requirement for a report is made pursuant to Water Code Section 13267, which allows the Water Board to require technical or monitoring program reports from any person who has discharged, discharges, proposes to discharge, or is suspected of discharging waste that could affect water quality. The attachment provides additional information about Section 13267 requirements. Any extension in the above deadline must be confirmed in writing by Regional Water Board staff.

Case # 41S0211 and 41S01105

If you have any questions, please contact Phyllis Flack of my staff at (510) 622-2420 or phyllis.flack@waterboards.ca.gov.

Sincerely,

Digitally signed by
Cheryl Prowell
Date: 2019.09.09
09:33:21 -07'00'

Michael Montgomery
Executive Officer

Attachment: Section 13267 Fact Sheet

Copy by email with attachment:
Richard A. Mielbye, FPG Development Group (rmielbye@fpg-corp.com)
Ken Price, AWR Corporation (kprice@awrcorp.net)
Tyson Fulmer, AWR Corporation (tfulmer@awrcorp.net)
Jacob Madden, San Mateo County, GPP (JMadden@smcgov.org)





San Francisco Bay Regional Water Quality Control Board

# Fact Sheet – Requirements for Submitting Technical Reports Under Section 13267 of the California Water Code

**What does it mean when the Regional Water Board requires a technical report?**
Section 13267[1] of the California Water Code provides that "...the regional board may require that any person who has discharged, discharges, or who is suspected of having discharged or discharging, or who proposes to discharge waste...that could affect the quality of waters...shall furnish, under penalty of perjury, technical or monitoring program reports which the regional board requires."

**This requirement for a technical report seems to mean that I am guilty of something, or at least responsible for cleaning something up. What if that is not so?**
The requirement for a technical report is a tool the Regional Water Board uses to investigate water quality issues or problems. The information provided can be used by the Regional Water Board to clarify whether a given party has responsibility.

**Are there limits to what the Regional Water Board can ask for?**
Yes. The information required must relate to an actual or suspected or proposed discharge of waste (including discharges of waste where the initial discharge occurred many years ago), and the burden of compliance must bear a reasonable relationship to the need for the report and the benefits obtained. The Regional Water Board is required to explain the reasons for its requirement.

**What if I can provide the information, but not by the date specified?**
A time extension may be given for good cause. Your request should be promptly submitted in writing, giving reasons.

**Are there penalties if I don't comply?**
Depending on the situation, the Regional Water Board can impose a fine of up to $5,000 per day, and a court can impose fines of up to $25,000 per day as well as criminal penalties. A person who submits false information or fails to comply with a requirement to submit a technical report may be found guilty of a misdemeanor. For some reports, submission of false information may be a felony.

**Do I have to use a consultant or attorney to comply?**
There is no legal requirement for this, but as a practical matter, in most cases the specialized nature of the information required makes use of a consultant and/or attorney advisable.

**What if I disagree with the 13267 requirements and the Regional Water Board staff will not change the requirement and/or date to comply?**
You may ask that the Regional Water Board reconsider the requirement, and/or submit a petition to the State Water Resources Control Board. See California Water Code sections 13320 and 13321 for details. A request for reconsideration to the Regional Water Board does not affect the 30-day deadline within which to file a petition to the State Water Resources Control Board.

**If I have more questions, whom do I ask?**
Requirements for technical reports include the name, telephone number, and email address of the Regional Water Board staff contact.

*Revised March 2014*
[1] All code sections referenced herein can be found by going to California Legislative Code Section search at http://leginfo.legislature.ca.gov/faces/codes.xhtml